IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EVANGELINA AGUILERA, et al. individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 13-CV-1245 |
| v. | ) ) | |
| WAUKESHA MEMORIAL HOSPITAL, INC., et al. | ) ) ) | |
| Defendants. | ) ) | |

## RESPONSE OF WAUKESHA MEMORIAL HOSPITAL, INC., ET AL. TO PLAINTIFFS' MOTION FOR CONDITIONAL CLASS CERTIFICATION AND COURT FACILITATED NOTICE

Waukesha Memorial Hospital, Inc., and ProHealth Care, Inc. (collectively "Hospital"), by Michael R. Lied, of Howard & Howard Attorneys PLLC, respond to Plaintiffs' Motion for Conditional Class Certification and Court Facilitated Notice as follows:

### I.      Introduction

Plaintiffs seek to have the Court conditionally certify two classes, Housekeepers and Certified Nursing Assistants ("CNAs") pursuant to Section 216(b) of Title 29.   Plaintiffs allege that they have been denied pay for work performed during meal periods, by being required to monitor a phone, pager, and/or walkie talkie, or by having had their unpaid meal period interrupted by work.  For the reasons discussed below, the Court should refuse conditional class certification or, in the alternative, should modify the proposed Court facilitated notice.

As Plaintiffs correctly recount, ProHealth Care Inc., is a community based health care system that includes Waukesha Memorial Hospital. The Hospital currently employs approximately 138 Housekeepers and 184 CNAs. (Plaintiffs' Memorandum in Support of

1

Motion for Conditional Certification and Court Facilitated Notice ("Plaintiffs' Memorandum" p. 3.) Plaintiffs also correctly state that the Hospital maintains a policy of deducting a one half hour meal period from all Housekeepers and CNAs for every shift worked. (Plaintiffs' Memorandum, pp. 1-2.) Plaintiffs incorrectly allege that Housekeepers and CNAs cannot leave the Hospital during their lunch break. (Plaintiffs' Memorandum, p. 5; Huppertz Dep., Dkt. No.36-2, p. 191; Thornburg Dep., Dkt. No. 36-5, p. 135; Time Recording Policy, Dkt. No. 36-4, p. WMH000125.)

## II.    Hospital's Timekeeping Equipment and Policy

The Hospital utilizes the well known Kronos timekeeping system, www.kronos.com. (Huppertz Dep., Dkt. No. 36-2, p. 74; Time Recording Policy, Dkt. No. 36-4, p. WMH000123; Thornburg Dep. Dkt. No. 36-5, p. 34; Smeaton Dep., Dkt. No. 36-8, p. 29.) Upon being hired, hourly employees, including Housekeepers and CNAs, are assigned an employee number designated "U..." as well as an ID badge, which is used to swipe into the Kronos terminal at the beginning of the shift, and to swipe out at the end of the shift.  (Huppertz Dep., Dkt. No. 36-2, pp. 35-36; Time Recording Policy, Dkt. No. 36-4, p. WMH000124; Thornburg Dep., Dkt. No. 36-5, pp. 41-43; Smeaton Dep., Dkt. No. 36-8, p. 29.)  If Housekeepers or CNAs choose to leave the Hospital premises for lunch, they are expected to swipe in and out on the Kronos system. (Huppert Dep., Dkt. No. 36-2, p. 89; Time Recording Policy, Dkt. No. 36-4, p. WMH000123; Thornburg Dep., Dkt. No. 36-5, p. 39.) In pertinent part the Time Recording Policy reads:

TIME RECORDING

Department Affected:  All ProHealth Care Departments

**Policy:**

Time Records are official, permanent and legal payroll records.  All employees have the responsibility to accurately report worked and non-worked paid hours.  The department

2

manager or a designated authorizer is responsible for approving time records prior to payroll processing.

**Procedure:**

1) **Time Recording**

All hourly and non-managerial exempt employees are required to uses a company approved method of recording time. The approved methods include the Kronos Time Keeping Terminal, TeleTime and the Manual Edit Log.

\*\*\*

b.    Recording time:  Hourly employees are required to record their time at designated time keeping terminals at the start of their shift and at the end of their shift.  Employees are expected to use the time keeping terminal closest to the location in which they are scheduled to work.  Employees who do not have access to a time keeping terminal will be required to utilize the TeleTime phone-based time keeping system.

\*\*\*

d.    Hourly employees who leave a ProHealth care facility during their scheduled shift for a non-work related activity, are required to swipe out at the timekeeping terminal and swipe back in when they return.  This includes meal breaks that are taken off campus.

\*\*\*

6) **Meal Breaks**
a.    Employees who stay on campus during their meal breaks are not required to swipe in or out for the meal break.  An automatic 30 minutes will be deducted from their shift.

\*\*\*

c.    If a meal break is not taken or the employee stays on campus and takes less than a 30 minute meal break, the "cancel lunch" function key must be utilized to indicate this a the time keeping terminal.  **Managers have the responsibility to review the use of the "cancel lunch" function within their department.**

\*\*\*

8) **Use of Manual Time Recording Edits**

a.    The expectation is that all hourly employees will use an approved electronic time recording system.  In the event an employee does not record their time electronically, he/she will need to manually record their missed swipe using the designated Manual Time Record Log Book located in each department.

3

        i. Examples of when employees cannot record their time include: forgetting to swipe, working off campus, and attending seminars off campus. The Manual Time Record Log Book is used for exceptions and does not replace the Kronos and TeleTime procedures.

   b. Authorizers or editors are responsible for entering these manual time records in the Kronos system.

   c. Swiping at the Kronos Clock is a performance expectation. Excessive missed punches in a rolling 3 month period will be addressed as follows:

| | | |
|---|---|---|
| i. | 3 missed punches | Verbal Coaching |
| ii. | 4 missed punches | Performance Documentation |
| iii. | 5 missed punches | Performance Documentation |
| iv. | 6 missed punches | Termination |

Reporting to work without your badge will count as 1 missed punch.

When missed punches are combined with other attendance concerns they will count as occurrences of tardiness. See Attendance policy for more information.

The Hospital also uses a system called Epic. CNAs use the Epic system to document patient information, but not to go on break. (Smeaton Dep. Dkt. No. 36-8, p. 29.) In turn, every day a supervisor logs in each Housekeeper into Epic by name, assigned work area and pager number. (Thornburg Dep., Dkt. No. 36-5, p. 96, 115.) Epic can be used to send the Housekeeper a page. (Thornburg Dep., Dkt. No. 36-5, p. 123.) If the Housekeeper logs out to go on break, a small coffee cup appears on the Epic screen, which lets the supervisor know the Housekeeper is on break and unavailable to work. (Thornburg Dep., Dkt. No. 36-5, p. 127.) A page to a Housekeeper will not go through if he or she is listed as being on break. (Thornburg Dep., Dkt. No. 36-5, p. 131.)

4

### III.  <u>Housekeepers</u>

#### A. Evangelina Aguilera

Generally, Aguilera works the evening shift, from 4:00 p.m. to 12:30 a.m., as a Housekeeper. (Aguilera Dep., Dkt. No. 36-6 p. 10.)  When she received her initial training, the Hospital instructed Aguilera about tracking her work hours. (Aguilera Dep., Dkt. No. 36-6, pp.10-11.)

Aguilera normally works in the Pain Management and Laboratory areas of the Hospital. (Aguilera Dep., Dkt. No. 36-6, p. 12.)  Aguilera has had at least eight different supervisors while employed by the Hospital. (Aguilera Dep., Dkt. No. 36-6, p. 13.)  Aguilera uses the Kronos swipe system, as well as the Manual Time Record Log Book (sometimes called the Manual Edit Log.) (Aguilera Dep., Dkt. No. 36-6, pp. 19-20.)  Aguilera understands that when she goes on break she is to dial 61100 on a phone, and dial the same number when she finishes her break. (Aguilera Dep., Dkt. No. 36-6, p. 33.)   As required by the Time Recording Policy, Aguilera makes a notation on the Manual Edit Log if she forgets to punch out or with regard to lunch; if there is an error she will tell her team leader. (Aguilera Dep., Dkt. No. 36-6, pp. 34-35.)   If she works more than forty hours, the Hospital pays Aguilera overtime. (Aguilera Dep., Dkt. No. 36-6, p. 40.)

Aguilera testified that "at times they would call us off our breaks to do some other work." (Aguilera Dep., Dkt. No. 36-6, p. 21.)  In a typical work day, Aguilera would receive a page at least twice. (Aguilera Dep., Dkt. No. 36-6, p. 25, 50.)  If the pager goes off, Aguilera is expected to call the person who paged her. (Aguilera Dep., Dkt. No. 36-6, p. 26, 59.)  While she believes other co-workers have been interrupted or missed lunch, she does not know whether they were later paid. (Aguilera Dep., Dkt. No. 36-6, p. 52.)  "At times, but not always" when Aguilera has

5

received a call during her lunch, she has said that she was at lunch and the caller indicated "…

never mind, continue your lunch" or words to that effect. (Aguilera Dep., Dkt. No. 36-6, p. 53.)

Aguilera does not know whether her co-workers swipe their cards when they go to lunch

or return from lunch. (Aguilera Dep., Dkt. No. 36-6, p. 31.)

There is a document which lists names and telephone numbers of supervisors and leads in

the Environmental Services Department so that Housekeepers can contact a supervisor or lead.

Aguilera has also sometimes talked to individuals in the Human Resources Department.

(Aguilera Dep., Dkt. No. 36-6, pp. 45-47.)

If she wants to leave the hospital grounds, Aguilera has to obtain authorization. While

she does not know whether her co-workers leave the property or not, she agrees she has left the

property. (Aguilera Dep., Dkt. No. 36-6, pp. 48-49.)

Many Housekeepers, if contacted while they are on break, simply tell the supervisor that

they are on break. (Declarations of Greg Busse, Bertha Chavez, Yolanda Ferreira, Tanya Marra,

Efrain Perez, Jennifer Petrie, Janice Vasquez, Gloria Geoffroy, Pat Smith, Dan Boeck, Reynaldo

Ferreira, Lea Grunau, Dianne Mayorga, Matthew Strike, Virginia Smith and John Siverling,

Lupe Valdez and Christina Nunez.) Some Housekeepers have never been paged during a break.

(Declarations of Robert Smith, Pauline Ortega, Penny Brown, Irene Leonard, Gene Heling, and

Patricia Gateris.)

**B. Angeles Gonzalez**

Gonzalez is the sole opt-in and has not yet given a deposition, but did provide a

Declaration. Gonzalez formerly worked as a Housekeeper. (Dec. of Gonzalez, Dkt. No. 35, para.

2.) Gonzalez had several supervisors during her employment. (Dec. of Gonzalez, Dkt. No. 35,

para. 4.) Gonzalez "frequently" received calls on her pager and/or walkie talkie, and "often" had

6

to leave her meal break to perform work. (Dec. of Gonzalez, Dkt. No. 35, para. 7.) Gonzalez alleges that other Housekeepers were interrupted or required to do work during their meal breaks, though she does not identify them or state whether or not they were paid. Marian Thornburg and John Kraatz allegedly told Gonzalez she had to respond to calls during her unpaid meal breaks. Gonzalez claims she would be "verbally disciplined" if she did not respond to a call, including during her unpaid meal breaks. Gonzalez alleges that the Hospital required her to stay on its premises during her meal breaks. (Dec. of Gonzalez, Dkt. No. 35, para. 10.) Gonzalez asserts Thornburg and Kraatz told her and other Housekeepers that they had to remain on the premises in order to respond to calls for help. (Dec. of Gonzalez, Dkt. No. 35, para. 13.) Inconsistently, but like Aguilera, Gonzalez alleges that if she did leave the premises during her meal breaks, she was required to have permission from her supervisor. (Dec. of Gonzalez, Dkt. No. 35, para. 12.) Gonzalez alleges that "at times" she reported to Kraatz that she did not receive a thirty minute meal break, and that despite this notification, she was not paid for these meal periods. (Dec. of Gonzalez, Dkt. No. 35, para. 15.) Gonzalez fails to allege whether or not she understood the Manual Edit Log or the "cancel lunch" button on the Kronos system, nor does she provide any dates which would allow verification of her claim. In fact, Gonzalez canceled her automatic meal deduction at least six times. (Dec. of Greenhill, Ex.D.)

## IV. CNAs

### A. Angelina Nunez

CNAs are assigned to a variety of units within the Hospital (Smeaton Dep., Dkt. No. 36-8, pp. 15-16), and work for a variety of nurse managers or supervisors. (Smeaton Dep., Dkt. No. 36-8, pp. 18-19.) All CNAs participate in a new employee orientation, as well as annual training. (Smeaton Dep., Dkt. No. 36-8, pp. 17-18, 20.)

The Hospital employed Nunez as a CNA. (Nunez Dep., Dkt. No. 36-7, p. 8.) Nunez worked on the Ortho/Neuro floor, designated 4 NW, doing such things as taking vital signs, caring for patients, and getting them ready for bed. (Nunez Dep., Dkt. No. 36-7, pp. 16-17, 20.) Nunez worked the night shift, 7:00 p.m. to 7:00 a.m. (Nunez Dep., Dkt. No. 36-7, p. 11.) There were between three and four CNAs on the night shift depending on the work load. There were more CNAs during the day and second shift. (Nunez Dep., Dkt. No. 36-7, p. 17.) Nunez received instruction on the Kronos system. (Nunez Dep., Dkt. No. 36-7 p. 10.)

When she began her shift, Nunez would "punch" into the Kronos system. (Nunez Dep., Dkt. No. 36-7, p. 11.) At the end of the shift, Nunez would swipe in the Kronos system again. (Nunez Dep., Dkt. No. 36-7, p. 19.)

There is a charge nurse as well as a manager who is in charge of the whole floor. (Nunez Dep., Dkt. No. 36-7, p. 18.) Jane Smeaton served as the manager, and "Rachel" (Nunez did not recall her last name) served as the charge nurse on Nunez's shift on 4NW. (Nunez Dep., Dkt. No. 36-7, pp. 18-19.) Nunez did not interact very often with Smeaton. (Nunez Dep., Dkt. No. 36-7, p. 22.) Nunez received a phone for her work use. (Nunez Dep., Dkt. No. 36-7, p. 19.) The phone could be called by patients, other nurses, or CNAs. (Nunez Dep., Dkt. No. 36-7, p. 20.) Nunez was typically responsible for between eight and ten patients, sometimes twelve. (Nunez Dep., Dkt. No. 36-7, p. 20.) On the night shift, Nunez normally worked closely with the charge nurse. (Nunez Dep., Dkt. No. 36-7, p. 22.) Nunez typically worked three twelve-hour days in a week. (Nunez Dep., Dkt. No. 36-7, p. 22.) She worked six days in a two week shift. (Nunez Dep., Dkt. No. 36-7, p. 24.) Nunez says she "never" worked forty hours, and thus she seldom received overtime. (Nunez Dep., Dkt. No. 36-7, p. 34.)

Nunez had difficulty taking an uninterrupted meal break, and might have to eat while doing charting or some other task. (Nunez Dep., Dkt. No. 36-7, p. 25.) On one occasion she asked Rachel if she could punch out and go to lunch, and Rachel allegedly said, "You can't because of the budget." (Nunez Dep., Dkt. No. 36-7, p. 26.) Other than the one instance when she talked to Rachel, Nunez did not discuss the issue with anyone else, and Nunez "never" went to Human Resources. (Nunez Dep., Dkt. No. 36-7, p. 30.) Since that single event, "Nunez just didn't ask anymore." (Nunez Dep., Dkt. No. 36-7, p. 26.) Nunez has no records of situations when she was not able to take an uninterrupted lunch period. (Nunez Dep., Dkt. No. 36-7, pp. 28-29.) Nunez alleges she never left the Hospital, but does not recall ever being told she could not. (Nunez Dep., Dkt. No. 36-7, p. 30.) Nunez received the Hospital's Employee Handbook. (Nunez Dep., Dkt. No. 36-7, p. 32.)

There was a Manual Edit Log on a table in the break room. Like Housekeepers, CNAs use the Manual Edit Log if they need to request edits to their Kronos time. (Smeaton Dep., Dkt. No. 36-8, p. 36.) Nunez made entries on at least a couple of occasions, including one when she did not receive a lunch. (Nunez Dep., Dkt. No. 36-7, pp. 34-36; Smeaton Dep., Dkt. No. 36-8, p. 30.) Nunez is "pretty sure" her pay was then adjusted. (Nunez Dep., Dkt. No. 36-7, p. 36.)

In fact, between February 2010 and the end of December 2013, Nunez actually cancelled her automatic meal deduction more than fifty times. Other CNAs also regularly cancelled their meal deductions. (Dec. of Greenhill, Ex A-B.)

Some of the Hospital departments are "twenty-four hour" departments, but others are not. (Smeaton Dep., Dkt. No. 36-8, pp. 21-22.) For twenty-four hour departments, when a patient pushes the nurse help button it rings first to the CNA phone, and next to the RN if the CNA does not answer. (Smeaton Dep., Dkt. No. 36-8, p. 28.) While someone must possess each phone, the

9

CNA is entitled to pass it off to the RN or to another CNA. (Smeaton Dep., Dkt. No. 36-8, p. 26, 46.) (Smeaton Dep., Dkt. No. 36-8, p. 30.) If a CNA receives a call, there is no specified response time. (Smeaton Dep., Dkt. No. 36-8, p. 31.) The CNA's phone actually indicates whether or not it is an emergency call. (Smeaton Dep., Dkt. No. 36-8, p. 39.) The CNA may ignore a regular call--and even an emergency call, if responding to the call would endanger another patient. (Smeaton Dep., Dkt. No. 36-8, pp. 40-41.) Non twenty-four hour departments are outpatient. (Smeaton Dep., Dkt. No. 36-8, p. 48.) Some CNAs in a non twenty-four hour department function as a transporter. These employees move patients from one area to another; their primary role is to transport. (Smeaton Dep., Dkt. No. 36-8, p. 49.) There are not nurse call lights in all areas, including the post-anesthesia care unit. (Smeaton Dep., Dkt. No. 36-8, p. 50.) How the phone is used is different between a twenty-four hour department and a non twenty-four hour department. (Smeaton Dep., Dkt. No. 36-8, p. 51.) Most CNAs take their thirty minute meal break. (Smeaton Dep., Dkt. No. 36-8, p. 54.) It is "infrequent" for a CNA to be called during his or her lunch break. (Smeaton Dep., Dkt. No. 36-8, p. 54.)

## V.     Argument

### A. Introduction

The Hospital denies that it permits, or has knowingly permitted, any of its employees to work any hours without properly recording them, or being fully compensated for them, as required by the Fair Labor Standards Act ("FLSA"). To the contrary, the Hospital's policy with respect to its hourly, non-exempt employees requires that such employees receive compensation for any hours they work, and employees are responsible for accurately entering the actual hours they work, including overtime and meal periods, in Kronos or the Manual Edit Log.

10

The Hospital further denies that Plaintiffs have proffered sufficient evidence to warrant conditional certification of their claims pursuant to Section 216(b) of Title 29. The analysis is not a mere formality. *Adair v. Wisconsin Bell Inc.*, No. 08-C-280, 2008 WL 4224360, at *3 (E.D. Wis. Sept. 11, 2008.) Instead, "it serves an important and functional step in the certification process." *Id.,* at *4. To that end, "[w]here the plaintiff has not made at least a modest factual showing that certification is proper, '[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'" *Id.* (quoting *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2006)); *see also, Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266-67 (D. Minn. 1991) ("The courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up of litigation' through unwarranted solicitation.")

One of the concerns that motivated Congress to add the "opt-in" provision to Section 16(b) of the FLSA included the financial burdens caused to employers confronting overtime litigation was *Adair*, 2008 WL 4224360, at *4 (relying on *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982.)) Plaintiffs have already caused the Hospital to undertake a significant cost in time, effort, and money through the course of the discovery that has taken place to date. Plaintiffs' Motion for Conditional Certification on the basis of so little evidence demonstrates the unfairness of a case like this.

The parties and Court would waste time and resources should conditional certification be granted in this case. Much of the evidence submitted in support of Plaintiffs' Motion is inconsistent, inadmissible, or inaccurate. More significantly, what remains suggests, at best, the

11

possibility of sporadic policy enforcement issues, not a common policy, plan, or decision that violates the FLSA. As such, the Hospital requests that the Court deny Plaintiffs' Motion.

## B. The Court Should Apply The "Intermediate" Standard In Deciding Conditional Certification Because The Parties Have Undertaken Substantial Discovery

In a typical case, plaintiffs seek conditional certification after only minimal discovery has taken place, so the court bases its decision on the pleadings and any affidavits submitted. *See e.g., Austin v. Cuna Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006.)[1] Because the court has minimal evidence, plaintiffs need only "make 'a modest factual showing' that they are similarly situated to potential class members and that they and potential class members were 'victims of a common policy or plan that violated the law.'" *Espenscheid v. DirectSat USA, LLC*, No. 09-CV-625-BBC, 2010 WL 2330309, at *6 (W.D. Wis. June 7, 2010) (quoting *Austin*, 232 F.R.D. at 605.)

In light of the substantial discovery the parties completed before Plaintiffs moved for conditional certification, the Court should depart from the "lenient" conditional certification test advocated by Plaintiffs. In this case, Plaintiffs have deposed three Rule 30(b)(6) witnesses whose testimony covered a wide-range of topics including the merits of Plaintiffs' claims and class-related issues. The Hospital has deposed each of the named Plaintiffs. In addition, both parties have served and responded to requests for production of documents and interrogatories and, between them, have exchanged thousands of pages of documents and electronic data. Plaintiffs have not only conducted substantial discovery, but have used that discovery to support their Motion.

---

[1] *See also Bunyan v. Spectrum Brands Inc.,* No. 07-CV-0089-MJR, 2008 WL 2959932, at *2 (S.D. Ill. July 31, 2008) ("The first step typically occurs where the parties have engaged only in minimal discovery. At this stage, the Court conducts a more lenient analysis of whether potential class members are "similarly situated," though mere allegations are insufficient, and some evidence to support the allegations is required.") (citations omitted)

Accordingly, the Court should apply an intermediate standard under which Plaintiffs must satisfy a more rigorous burden. The level of scrutiny the court uses to assess conditional certification "is largely dependent upon the amount of information before the court." *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 893 (N.D. Iowa 2008.)

Where the parties have engaged in substantial discovery before plaintiffs move for conditional certification, plaintiffs face a higher burden in proving that they and potential class members are similarly situated. *Bunyan*, 2008 WL 2959932, at *3-4; *see also, Bouaphakeo*, 564 F. Supp. 2d at 895-96 (applying intermediate scrutiny where some discovery conducted.)[2] The intermediate standard requires that Plaintiffs actually demonstrate, on the basis of all available evidence, that they and potential claimants are "similarly situated" in light of the following three factors: (1) the employment and factual settings of plaintiffs; (2) the various defenses available to defendants; and (3) considerations of fairness, procedure, and manageability. *Bunyan*, 2008 WL 2959932, at *8 (emphasis added) (citing *Bouaphakeo*, 564 F. Supp. 2d at 892.)

Here, a developed record exists, on the class-related issues and the merits of the named and sole opt-in Plaintiffs' claims. Therefore, the Court should apply the heightened, intermediate

---

[2] *See also, Valcho v. Dallas Cnty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008) (applying intermediate standard after three months discovery, explaining that the "rationale for a leniency is that at the early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence.... This rationale disappears, however, once plaintiffs have had an opportunity to conduct discovery"); *Villanueva-Bazaldua v. Trugreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification."); *Thiessen v. General Elec. Capital Corp.*, 996 F. Supp. 1071, 1081 (D. Kan. 1998) (court adopted "intermediate approach" to conditional certification because parties had conducted three months of discovery prior to plaintiffs motion); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004) (declining to conditionally certify collective action in light of evidence presented by defendant, noting that "in a case in which the parties have conducted extensive discovery, it is appropriate to carefully consider the submissions of the parties with respect to the collective action allegations"); *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009) (stating that it would "base its certification determination on the evidence rather than the pleadings[,] considering] whether there is evidence of a widespread discriminatory plan, and whether, a matter of sound case management, a manageable class exists" because "Plaintiffs have had ample opportunity to obtain substantial information about Defendant's policies and procedures and Plaintiffs' claims")

standard and evaluate whether Plaintiffs have presented sufficient evidence to demonstrate that they are "similarly situated." As detailed below, the record evidence shows that each of these factors weighs against Plaintiffs' Motion.

At a superficial level, all Housekeepers do the dame basic job. Similarly, CNAs do the same basic job, except for transports. However, these employees work different shifts, in multiple locations in the Hospital, and for many different supervisors. Thus, the employment and factual settings vary significantly. As outlined above, Plaintiffs could leave the Hospital property and could easily indicate they were on break or at lunch. If Plaintiffs failed to follow policy for time recording, they have done so on an individual basis, contrary to how their co-workers handled the situation. Hence Plaintiffs are subject to individual defenses of failure to follow policy.

Finally, certification would not promote manageability, fairness, or procedure. As argued below, the Hospital's policy is entirely lawful. Therefore it will be necessary to depose each opt-in class member to determine if he or she missed meal periods, when, how often, and why.

## C. The Hospital's Policies and Kronos System are Lawful, and in Compliance with the FLSA

Conditional certification requires the Plaintiff to make a factual showing that she, and the individuals she purports to represent, were together the victims of a common policy, plan, or decision that violated the FLSA. *See, e.g., Adair*, 2008 WL 4224360, at *3 (citing *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006.))

Plaintiffs argue that this matter should be conditionally certified based on the Hospital's policy of taking an automatic thirty minute pay deduction from Housekeepers and CNAs. The basis for Plaintiffs' claim is that Housekeepers and CNAs are required to be able to hear and, if necessary, respond to a communication device during the meal break. This argument fails

14

because it misstates governing law. Simply carrying a pager, phone, or walkie talkie does not result in compensable time under the FLSA. The Hospital maintains a policy and practice to compensate hourly employees in the event their meal breaks are actually interrupted or missed. To the extent that the Plaintiffs were discouraged from correcting time records because of the actions or comments of a few supervisors on certain occasions, that is an individual, highly fact-specific question and does not meet the criteria for certification under the FLSA. Moreover, Plaintiffs have submitted no admissible evidence that this alleged practice extends throughout the Hospital.

The FLSA allows an automatic thirty minute deduction policy for meal breaks. *See Fengler v. Crouse Health Foundation, Inc.*, 595 F. Supp. 2d 189, 195 (N.D.N.Y) ("the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA".) Moreover, evidence of a thirty minute automatic meal break deduction alone fails to satisfy the first-step of an FLSA collective certification analysis, because it does not demonstrate that putative class members were victims of a common *unlawful* decision, policy, or plan. *See Saleen v. Waste Management, Inc.,* No. CIV-08-4959-PJS/JJK, 2009 WL 1664451, at *14 (D. Minn. June 15, 2009.) (denying collective certification and stating that an "automatic-deduction policy does not, on its face, state that employees will not be paid if they have worked through their meal breaks.") *aff'd* 649 F. Supp. 2d 937 (D. Minn. 2009.)

Plaintiffs also argue that the automatic deduction becomes unlawful where Housekeepers and CNAs are required to carry and respond to a communication device. The Seventh Circuit has adopted the "predominant benefit" test for determining whether meal periods constitute compensable work time under the FLSA. *Leahy v. City of Chicago,* 96 F.3d 228, n.2 (7th Cir.

1996); *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993.) Under this test, an employee is considered to be completely relieved from duty during a meal period when the employee's time is not spent predominantly for the benefit of the employer. *Leahy*, 96 F.3d at n.2. If during meal periods an employee's time and attention are primarily occupied by a private pursuit, presumably obtaining and eating food, then the employee is completely relieved from duty and is not entitled to compensation under the FLSA. *Id.*

The employees' obligation to carry and be able to respond to a communication device does not convert the meal break into time spent predominantly for the benefit of the Hospital. *Kaczmerak v. Mount Sinai Medical Center*, No. 86-C-0472, 1988 WL 81633 (E.D. Wis. Feb. 24, 1988.); *Albee v. Village of Bartlett*, 861 F. Supp. 680, 685 (N.D. Ill, 1994) (police officers had remain in radio contact during an unpaid lunch period.) Moreover, occasional interruptions do not convert a meal break into work time, because nearly any job can have demands during an employee's meal break. *Bridges v. Amoco Polymers, Inc.*, 19 F. Supp. 2d 1375, 1379 (S.D. Ga. 1997) ("most every employee in the Nation is subject to having his lunch hour interrupted by his employer in some fashion or another ...")

The three Declarations[3] submitted by Plaintiffs alleging that a few supervisors discouraged them from utilizing the Hospital's established lunch cancellation procedure is not sufficient to merit conditional certification of a collective action because it fails to allege a common, Hospital-wide unlawful policy, especially in light of the fact that Aguilera, Nunez, and Gonzalez clearly understood how to use the missed lunch Kronos function or the Manual Edit Log. *See Adair*, 2008 WL 4224360, at *7 (denying conditional class certification and stating that "[a]lleged FLSA violations stemming from the enforcement decisions of individual supervisors,

---

[3] Note that the Declarations are not actually given subject to penalty of perjury since they are purportedly made under 29 U.S.C. §1746.

16

rather than a Hospital-wide policy or plan are not appropriate for collective treatment."); *see also, Thompson v. Speedway Superamerica LLC*, No. 08-CV-1107, 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (denying conditional class certification because plaintiffs failed to submit evidence that the reason they were not compensated was because of a corporate decision to ignore their employer's published policies and not because of a rogue store manager); *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 963 (W.D. Mich. 2009) (denying conditional class certification where plaintiffs alleged that certain supervisors did not follow otherwise lawful policy.)

Determining why more than 200 Housekeepers and CNAs may have worked during a meal break and failed to use the Hospital's lunch cancellation policy is highly individualized inquiry and will require a fact intensive determination that is not appropriate for class certification. A collective action is a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action. Where, as here, the evidence fails to show that there is a common policy or plan that unlawfully affects a group of similarly situated employees, conditional certification should be denied because, as the Court said in *Adair*, "[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." 2008 WL 4224360, at *4.

"Putative class members must share more than a common allegation that they were denied overtime." *McElmurry v. U.S. Bank Nat'l Ass'n*, No. CV-04-642-HU, 2004 WL 1675925, at *10 (D. Or. July 27, 2004) (quoting *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002)) (both denying conditional certification.) In other words, "the mere fact that violations [allegedly] occurred cannot be enough to establish similarity." *Barron v. Henry Cnty. Sch. Sys.*,

17

242 F. Supp. 2d 1096, 1104 (M.D. Ala. 2003.) Otherwise, to say that employees are similarly situated simply because they claim violations of the law by the same employer, would be to conclude that any time an employer had two or more employees who allegedly were not being paid overtime they claim was due, the employees would be similarly situated and allowed to proceed with a collective action. *Id.* Hence, under the appropriate intermediate standard, the record evidence and the relevant decisional authority compels denial of Plaintiffs' Motion.

## D. Plaintiffs' Allegations are Based on Inadmissible Hearsay or are Speculation

In each of the Declarations submitted in support of Plaintiffs' Motion, the Declarants recount discussions with, or observations of, other employees. Any such discussions are inadmissible hearsay, and should be ignored by the Court for purposes of deciding Plaintiffs' Motion.

Similarly, Declarations or testimony that other employees had to carry a communication device or did not leave Hospital property is of no value because the other employees are not identified and because Plaintiffs concede they do not know if co-workers were paid in such circumstances. To infer otherwise constitutes sheer speculation.

Judge Griesbach has endorsed the requirement of admissible evidence:

> I find the requirement of admissible evidence to be the better approach. As noted above, even conditional certification may have significant consequences for parties to an action. I disagree with the White Court's conclusion that to require admissible evidence would defeat the purpose of a two-stage certification analysis. The requirement of a modest factual showing by admissible evidence that certification is appropriate does not replace further inquiry once opt-in plaintiffs have been identified, at which point a greater degree and specificity of evidentiary support is needed to stave off a motion for decertification. Rather, it provides a meaningful basis upon which the Court may determine whether to exercise its discretion with regard to a request for court-facilitated notification of potential class members.

18

*Adair*, 2008 WL 4224360, at *8; *see also Mares v. Caesars Entm't, Inc.,* No. 4:06-CV-0060-JDT-WGH, 2007 WL 118877, at *9 (S.D. Ind. Jan. 10, 2007) ("plaintiffs [must] offer admissible evidence to support their claims that those they wish to represent are similarly situated."); *McElmurry v. U.S. Bank Nat'l Ass'n,* No. CV-04-642-HU, 2004 WL 1675925, at *10 (D. Or. July 27, 2004) ("[P]laintiffs are required to show through admissible evidence a 'reasonable basis' for their claim that the employer acted on a class-wide basis."); *LG Elecs., Inc. v. Quanta Computer Inc.*, 520 F. Supp. 2d 1061, 1064 (W.D. Wis. 2007) (disregarding portions of affidavit that lack foundation and do not rely on personal knowledge.)

The Hospital requests that any and all statements regarding what other employees may or may not have said to the Plaintiffs in this case be stricken as inadmissible hearsay. Plaintiffs' observations of other employees should be excluded as well. Plaintiffs failed to identify those other employees, and Plaintiffs can only speculate that they were not paid.

### E. There is No Proof of a "No-Overtime" Directive, or Other Common Policy, Plan, or Decision by the Hospital that Violates the FLSA

The Court must determine whether the admissible facts and allegations provide sufficient proof of a common policy, plan, or decision by the Hospital *that violates the FLSA*.

Because evidence of the existence of an alleged unlawful common policy or plan, uniformly applied to the putative class members, forms a critical element in collective action cases alleging off-the-clock work, district courts routinely deny certification where the plaintiff fails to demonstrate the existence of such a policy or plan, or where the evidence establishes that the alleged violations are instead the result of individual decisions made on a decentralized basis. *See, e.g., Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d. 1042, 1046 (N.D. Ill. 2003) (denying conditional certification because affidavits from two out of fifty employees alleging FLSA violations did not "rise to the level of a common policy or plan by Lifeway that violated the

FLSA. This is not even a 'modest factual showing' of a common policy or plan, as that term has been used in other cases."); *Veerkamp v. U.S. Sec. Assocs. Inc.,* No. 1:04-CV-0049-DFH-TAB, 2005 WL 775931, at *2 (S.D. Ind. Mar. 15, 2005) (holding that affidavits from five employees did not meet the threshold to conditionally certify a nationwide class action); *Mielke v. Laidlaw Transit, Inc.,* 313 F. Supp. 2d 759, 763 (N.D. Ill. 2004) (denying motion to certify collective action beyond plaintiffs who had already opted into action because plaintiffs failed to show evidence of uniform policy that violated FLSA.) There is no evidence of a common plan, policy, or decision that violates the FLSA.

### F. Certification Does Not Promote Efficiency and Judicial Economy Because Plaintiffs Fail to Demonstrate a Sufficient Desire to Participate in the Litigation By Members of the Putative Class

As pointed out above, in view of the Hospital's lawful policies, it will be necessary to make individual inquiries as to whether employees followed policy, and if not, why not.

Moreover, courts recognize that conditional certification should be denied unless a plaintiff can show a sufficient interest in the litigation on the part of putative class members. *See, e.g., Lance v. Scotts Co.*, No. 04 5270, 2005 WL 1785315, at *6 (N.D. Ill. July 21, 2005) (denying motion for conditional certification where plaintiff failed to come forward with any evidence-other than his own hearsay testimony-that other employees shared his concerns) (citing *Cash v. Conn Appliances Inc.*, 2 F. Supp. 2d 884, 897 (E.D. Tex. 1997) and *Dybach v. State of Fla. Dep't of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991)); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 362-63 (M.D. Ala. 1999) (fifteen affidavits by employees from one restaurant location with specific allegations of wage violations was sufficient only for notice to employees at that location.); *Bunyan*, 2008 WL 2959932, at *6 (S.D. Ill. July 31, 2008) ("some courts have required plaintiffs to present evidence that 'other similarly situated individuals desire

20

to opt in to the litigation.'") (quoting *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164-65 (D. Minn. 2007)); *White v. KCPAR, Inc.*, No. 6:05-CV-1317-ORL22DAB, 2006 WL 1722348, at *3 (M.D. Fla. June 20, 2006) ("A showing that others desire to opt in is required before certification and notice will be authorized by the court."); *King v. W. Corp.*, No. 8:04-CV318, 2006 WL 118577, at *12 (D. Neb. Jan. 13, 2006) (same); *Wombles v. Title Max of Ala., Inc.*, No. CIV-A-3-03-l158-CWO, 2005 WL 3312670, at *5-6 (M.D. Ala. Dec. 7, 2005) (denying conditional certification where five named plaintiffs and two opt-ins were not sufficient to show that similarly-situated employees desired to join the lawsuit.) *Cf. DeKeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-488, 2008 WL 5263750, at *5 (E.D. Wis. Dec. 18, 2008) (court granted conditional certification because sixty-seven individuals had already opted into the litigation prior to the dissemination of any court- approved notice, showing there was a sufficient interest in the litigation to support conditional certification.)

In *Parker*, the district court denied the plaintiffs' conditional certification motion because they had not "proffered evidence that other similarly situated individuals desire to opt-in." *Parker*, 492 F. Supp. 2d at 1164-65. The court gave three reasons for its decision. First, the court reasoned that it would be inappropriate and unfair to put an employer to the expense and effort of notice without some showing that putative class members desired to join the litigation. *Id.,* at 1165. Second, the court concluded that if similarly situated employees declined to opt-in, no purpose would have been served by conditionally certifying a class. *Id.* Third, the court reasoned that, if a plaintiff were required to show only that other potential plaintiffs exist, this would render conditional certification automatic. *Id.* The court explained that if a plaintiff were not required to show interest among putative collective members prior to conditional certification, then:

> any plaintiff who is denied overtime pay [could] file suit under the FLSA and, as
> long as her complaint is well-pled, receive preliminary class certification and send
> court-approved notice forms to every employee. This is, at best, an inefficient
> and overbroad application of the opt-in system, and at worst it places a substantial
> and expensive burden on a defendant. More importantly, automatic preliminary
> class certification is at odds with the Supreme Court's recommendation to
> ascertain the contours of the § 216 action at the outset.

*Id.* (internal quotations omitted.) Ultimately, the court held that because it had a "responsibility to avoid the stirring up of litigation through unwarranted solicitation," conditional certification was inappropriate without a showing that similarly situated individuals desired to join. *Id.* (citations omitted.)

Here, Plaintiffs have provided no evidence to suggest that members of the putative class are likely to join the case if notified. After the passage of more than six months, only one other individual, Angeles Gonzalez, has joined the action. A single opt-in is an insufficient showing of interest to impose the enormous expense and burden that the Hospital would incur if Plaintiffs' request were granted. This Court should deny conditional certification because Plaintiffs cannot demonstrate a sufficient desire to participate in the litigation on the part of the putative class members.

## VI. Plaintiffs' Proposed Notice is Deficient

In the event the Court is inclined to grant Plaintiffs' Motion, in whole or in part, the Hospital asserts that there are multiple problems with Plaintiffs' proposed Notice of FLSA Lawsuit ("Notice") that should be resolved prior to distribution.

First, Plaintiffs' proposed Notice contains the full caption of the case. Such information is unnecessary and may suggest that the Court has endorsed the merits of the underlying claims. *See Woods v. N.Y. Life Ins. Co.,* 686 F.2d 578, 581 (7th Cir. 1982); *see also, DeKeyser v. Thyssenkrupp Waupaca, Inc.,* No. 08-C-488, 2008 WL 5263750, at *6 (E.D. Wis. Dec. 18,

22

2008) ("I agree that both are unnecessary and could have the effect of creating the appearance of judicial sponsorship of the notice.")

Second, the Notice, which includes the name of the district judge assigned to this case, reasonably could be perceived by a non-lawyer as judicial endorsement of Plaintiffs' claims. The Supreme Court has cautioned courts to avoid "even the appearance" of any judicial sponsorship of plaintiffs' claims. *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 174 (1989); *see also, Woods v. New York Life Ins. Co.*, 686 F.2d 578, 582 (7th Cir. 1982) (vacating authorization of notice because it was on court letterhead and included signature of judge and, therefore, connoted judicial sponsorship of the notice.); *Boyd v. Jupiter Aluminum Corp.*, No. 2:05-CV-227-PPSAPR, 2006 WL 1518987, at *6 (N.D. Ind. May 31, 2006) (requiring removal of names of district and magistrate judge from caption on notice.)

Third, Plaintiffs' proposed Notice mentions only in passing the Hospital's position. The Hospital requests that the proposed Notice state:

> Waukesha Memorial declares that it has complied with the FLSA, and that the Plaintiffs are not similarly situated with other Housekeepers or CNAs. Waukesha Memorial also denies that Housekeepers or CNAs were required to work "off-the-clock" without overtime compensation or through meal periods. Waukesha Memorial asserts that Housekeepers and CNAs were not threatened, discouraged, prevented, or inhibited from accurately entering all of the time they actually worked on any given day, and that Housekeepers and CNAs were not instructed to inaccurately enter the time they actually worked on any given day.

Fourth, Plaintiffs' proposed Notice does not fully inform potential parties what participation in this litigation may mean. Potential parties should receive full notice regarding the benefits and risks of joining a collective action. The Hospital therefore requests that the proposed Notice be amended, to include the following guidance:

- While the suit is proceeding, you may be required to provide information, sit for depositions, and testify in court.

23

- If you elect to participate in this litigation, your employer may be required to produce to Plaintiffs' counsel (and possibly the Court and other Plaintiffs in this case) your personnel file, pay information, and hours worked records.

- By choosing to opt-in you may be required to bear a proportionate share of Waukesha Memorial's costs should it prevail at trial. These costs will not be substantial, and, in a case with a large number of plaintiffs, are often less than $100.

Fifth, Plaintiffs' proposed Notice twice states that the Hospital is prohibited from retaliation. There is no reason for this language since there is no reason to anticipate retaliation—certainly there has been none against current employee, Aguilera. In any event, there is no reason to have this information stated twice.

Sixth, the Hospital asserts that a period of ninety days for potential parties to opt-in under Section 216(b) is too long. Forty-five days is adequate. *See DeKeyser*, 2008 WL 5263750, at *6 (E.D. Wis. 2008) (reducing notice period from request of 120 days, to forty-eight days – forty-five, plus three for mailing - from the date notice was sent); *Williams v. Cargill Meat Solutions Corp.,* No. 09-C-1006, 2010 WL 2643405, at *2 (ordering a forty-five-day opt-in period where sixty days was requested by plaintiff.)

Seventh, Plaintiffs have included under "Who is Sending this Notice," (and then at the end of their proposed Notice) a statement that the Court has taken no position about the merits of Plaintiffs' claims or Defendant's defenses. At a minimum, such a statement should be included on the first page of the Notice. *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652, at *4 (N.D. Cal. Mar. 28, 2006) (plaintiffs' proposed notice could be perceived as judicial endorsement of action and statement that court took no position on case was insufficient because it was "seemingly tacked onto the end of the notice.")

Eighth, Plaintiffs' proposed Notice fails to adequately explain to the putative class members their options with respect to retaining other counsel or bringing an individual lawsuit.

24

Indeed, notice forms approved by courts in this circuit often include a statement advising putative class members of their right to counsel of their own choice. *See Monroe v. United Air Lines, Inc.,* 90 F.R.D. 638, 641 (N.D. Ill. 1981) ("It is entirely your own decision whether or not [to opt-in to the action] and if you do elect to become a party plaintiff, whether you prefer to be represented by the present plaintiffs' attorneys or by an attorney of your choosing."); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438, 449 (N.D. Ill. 1982) ("[I]f you wish to join the suit as a party plaintiff, it is entirely your own decision as to whether you prefer to be represented by the present plaintiffs' attorneys or by an attorney of your own choosing.")

Ninth, the Notice should clarify that the Court has only conditionally approved the collective action and may later decertify the class and dismiss any opt-in plaintiffs. *See North v. Bd. of Trs.*, 676 F. Supp. 2d 690, 699 (C.D. Ill. Nov. 9, 2009) (court revised notice to show conditional nature of certification, holding that the notice could be misleading otherwise); *Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777, 781 (N.D. Ill. 2007) (same.)

## VII.    The Court Should Deny Plaintiffs' Request For Disclosure Of Telephone Numbers And Social Security Numbers Of Putative Class Members

Plaintiffs request that the Hospital provide Plaintiffs' attorneys with each putative class member's name, dates of employment, telephone numbers, and last known mailing address, within ten business days of this Court's order granting conditional certification. Additionally, Plaintiffs request that the Hospital provide a list of Social Security numbers for all individuals who opt-into the case.

The Hospital would disclose employees and former employees' names and last known addresses to a neutral third-party administrator that could mail the approved notice to the putative class members. The administrator will provide the parties with a list of all individuals who opt into the case and can turn over the contact information for these individuals. This

25

method allows putative class members to receive notice of the lawsuit, while protecting the private information of those who do not wish to participate. *See, e.g., Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124-1130, at *10 (N.D. Cal. 2009) (ordering a third-party administrator to distribute the notices where plaintiffs did not explain why it would be preferable for their counsel to oversee distribution of the notice); *Gilbert v. Citigroup, Inc.*, No. 08-0385 SC, 2009 WL 424320, at *6 (N.D. Cal. Feb. 18, 2009) (same.)

If the Court declines to use a third party administrator to send a notice, the Court should deny Plaintiffs' request for putative class members' telephone numbers. Courts generally refuse to require defendants to provide the telephone numbers of putative plaintiffs upon conditional certification because: (1) they do not facilitate the mailing of the court-approved notice, and (2) they threaten the privacy interests of putative plaintiffs. *See Hintergerger v. Catholic Health Sys.*, No. 08-CV-3SOS, 2009 WL 3464134, at *11 (W.D.N.Y. Oct. 21, 2009) ("[T]he Court agrees that, in the interest of privacy, [defendant] need not produce phone numbers"); *Stickle v. SCI Western Market Support Center*, No. 08-083-PHX-MHM, 2009 WL 3241790, at *7 (D. Ariz. Sept. 30, 2009) ("Because notice will be accomplished via first class mail, there is no need to provide plaintiff with telephone numbers of all the potential conditional class members. In any event… [it] seems like a needless intrusion into the privacy of these individuals"); *Delgado v. Ortho-McNeil, Inc.,* No. SA-CV-07263-CJCMLGX, 2007 WL 2847238, at *3 (C.D. Cal. Aug. 7, 2007) (refusing to order defendant to produce phone numbers of putative class members due to privacy concerns); *Aguilar v. Complete Landsculpture, Inc.,* No. Civ-A-3:04-CV-0776 D, 2004 WL 2293842, at *5 (N.D. Tex. Oct. 7, 2004) (declining to require defendant to turn over phone numbers of putative class members because "highly personal information about persons who may in fact have no interest in this litigation should not be disclosed on the thin basis that

Plaintiffs' counsel desires it"); *Fox v. Martin Transp. Syst, Inc.*, No. 1:08-CV-305, 2009 WL 3416021, at *3 (N.D. Ind. Oct. 19, 2009) (refusing to order the defendant to produce phone numbers of putative class members.) See also, the Wisconsin Rules of Professional Conduct, SCR 20:7.3(a) ("A lawyer shall not by in-person or live telephone or real-time electronic contact solicit professional employment from a prospective client...") Accordingly, the Court should not require the Hospital to produce putative class members' telephone numbers.

The Court should also not require the Hospital to produce social security numbers for putative class members. Plaintiffs do not explain why they need this information before the Court has determined (a) whether such individuals are in fact similarly situated to Plaintiffs, and (b) that the Hospital is liable to Plaintiffs or any opt-in plaintiff. Accordingly, this Court should deny Plaintiffs' request for putative class members' social security numbers, as this request is premature. *See e.g., Sharpe v. APAC Customer Servs., Inc.*, No. 09-CV-329 BBC, 2010 WL 135168, at *5 (W.D. Wis. Jan. 11, 2010) (denying plaintiffs request for potential plaintiffs' social security numbers); *Kelly v. Bluegreen Corp.,* 256 F.R.D. 626, 632 (W.D. Wis. 2009.) (same.)

In any event, Plaintiffs have provided no justification for requiring the Hospital to produce putative class members' contact information within ten calendar days of this Court's order granting conditional certification. Fourteen business days is more appropriate. *See Espenscheid*, 2010 WL 2330309, at *16.

## Conclusion

For the foregoing reasons, the Court should deny the Motion for Conditional Certification. In the alternative, the Court should refuse and reform the proposed Notice and require that the Notice be provided by a third-party administrator. Finally the Court should not order production of potential opt-ins' telephone and social security numbers.

27

Respectfully submitted,


By: ___/s/ Michael R. Lied_____
            MICHAEL R. LIED


MICHAEL R. LIED (IL ARDC NO. 06197844)
HOWARD & HOWARD ATTORNEYS PLLC
One Technology Plaza, Suite 600
211 Fulton Street
Peoria, Illinois 61602
Telephone: 309-672-1483
Facsimile: 309-672-1568
mlied@howardandhoward.com

EMILY E. BENNETT (IL ARDC NO. 06305461)
HOWARD & HOWARD ATTORNEYS PLLC
200 S. Michigan Avenue #1100
Chicago, Illinois 60605
Telephone: 312-456-3422
Facsimile: 312-939-5617
ebennett@ howardandhoward.com

28

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on May 30, 2014, I caused a true and correct copy of the foregoing document to be served on the following by placing the same in an envelope with first-class postage fully prepaid in the U.S. Mail at 211 Fulton Street, Peoria Illinois 61602 before 5:00 p.m.:

Summer H. Murshid
Larry Johnson
Timothy P. Maynard
Hawks Quindel, S.C.
P.O. Box 442
Milwaukee, WI 53201

By:     /s/ Michael R. Lied
        Michael R. Lied