IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EVANGELINA AGUILERA, and | ) | |
| ANGELINA NUNEZ, individually | ) | |
| and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 13-CV-1245 |
| v. | ) | |
| | ) | |
| WAUKESHA MEMORIAL HOSPITAL, INC. and | ) | |
| PROHEALTH CARE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DECERTIFY THE FLSA COLLECTIVE ACTION

Defendants Waukesha Memorial Hospital, Inc. ("WMH"), and ProHealth Care, Inc. ("ProHealth Care") (collectively, "Defendants") respectfully request that the Court decertify two conditionally certified classes: a Collective Housekeepers Class and a Collective Certified Nursing Assistant Class. As demonstrated through the deposition testimony of the two Named Plaintiffs and 16 Opt-In Plaintiffs, the Plaintiffs in this matter are not so similarly situated that the matter should proceed as a collective action. Defendants respectfully submit the following Memorandum of Law in Support of Defendant's Motion to Decertify.

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

TABLE OF AUTHORITIES ............................................................................................ iii

I.     INTRODUCTION ....................................................................................... 1

II.    BACKGROUND ......................................................................................... 2

    A.    Time Keeping System .................................................................... 3

    B.    Time Recording Policy .................................................................. 3

III.    LEGAL STANDARD ................................................................................ 4

IV.    ARGUMENT .............................................................................................. 7

    A.    The Automatic Meal Deduction Policy is Legal ............................ 7

    B.    The Disparate Factual and Employment Settings Require Decertification ........... 9

        1.    Certified Nursing Assistants .................................................. 10

            a.    Named Plaintiff Nunez's testimony ............................. 11

            b.    The duties performed by the Opt-In CNA Plaintiffs differ among units .................................................................. 11

            c.    The Opt-In CNA Plaintiffs did not all carry communication devices .................................................. 12

            d.    The Opt-In Plaintiffs differ in their understanding of when they must answer the SpectraLink phone ..................................... 13

            e.    The Opt-In Plaintiffs are vastly different with respect to the frequency with which they are allegedly interrupted .................... 14

            f.    The Opt-In Plaintiffs' experience differed by shift ...................... 15

            g.    Opt-In Plaintiffs differ in the nature of the alleged interruptions . 15

            h.    The Opt-In Plaintiffs have disparate understandings of cancelling meal deductions in Kronos .......................................... 16

            i.    The Opt-In Plaintiffs differ in the practices implemented to avoid interruptions ....................................................... 16

            j.    The Opt-In Plaintiffs differ with respect to management knowledge of unpaid time worked ............................................... 17

i

    2.     Environmental Services Staff (EVS), Housekeepers ............................... 18

         a.     Named Plaintiff Evangelina Aguilera ........................................... 19

         b.     Housekeepers have different experiences with meal periods pre- and post-EPIC ........................................................................ 19

         c.     The Opt-In Plaintiffs differ in their understanding of the time keeping system ................................................................... 20

         d.     The Opt-In Plaintiffs differ in communication with supervisors regarding unpaid work ............................................... 21

         e.     The nature and frequency of alleged interrupted meal breaks differs among the Opt-In Plaintiffs based on unit assignments ................................................................................. 21

   C.     Plaintiffs Cannot Show There Was a Common Policy-to-Violate-the Policy ...... 22

   D.     Defendants Individualized Defenses Require Decertification ............................. 24

   E.     Fairness and Procedural Considerations Also Require Decertification ............... 26

V.     CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Adair v. Wisconsin Bell, Inc.,*
  No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ............................................... 23

*Albee v. Village of Bartlett,*
  861 F. Supp. 680 (N.D. Ill. 1994) ............................................................................................... 8

*Alexander v. City of Chicago,*
  994 F.2d 333 (7th Cir. 1993) ............................................................................................... 8, 24

*Alvarez v. City of Chicago,*
  605 F.3d 445 (7th Cir. 2010) ....................................................................................................... 5

*Anderson v. Cagle's, Inc.,*
  488 F.3d 945 (11th Cir. 2007) ................................................................................................. 6, 9

*Barron v. Henry Cnty. Sch. Sys.,*
  242 F. Supp. 2d 1096 (M.D. Ala. 2003) ................................................................................... 23

*Bridges v. Amoco Polvmers, Inc.,*
  19 F. Supp. 2d 1375 (S.D. Ga. 1997) .......................................................................................... 8

*Castle v. Wells Fargo Fin., Inc.,*
  2008 WL 495705 (N.D. Cal. Feb. 20, 2008) .............................................................................. 9

*Davis v. Food Lion,*
  792 F.2d 1274 (4th Cir. 1986) ................................................................................................... 26

*Duncan v. Phoenix Supported Living, Inc.,*
  No. 2:05 CV 1, 2007 WL 1033360 (W.D.N.C. Mar. 30, 2007) ........................................... 6, 24

*Espenscheid v. DirectSat USA, LLC,*
  2010 WL 2330309 (W.D. Wis. Jun. 7, 2010) ............................................................................. 5

*Fengler v. Crouse Health Foundation, Inc.,*
  595 F. Supp. 2d 189 (N.D.N.Y) .................................................................................................. 7

*Forrester v. Roth's IGA Foodliner,*
  646 F.2d 413 (9th Cir. 1981) ..................................................................................................... 26

*Frye v. Baptist Mem'l Hosp.,*
  No. 07-2708, 2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010) ........................................ passim

*Hinojos v. Home Depot, Inc.,*
  No. 06-cv-108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ...................................................... 25

*Johnson v. Big Lots Stores, Inc.*,
    561 F. Supp. 2d 567 (E.D. La. 2008)..................................................... 7, 27

*Jones-Turner v. Yellow Enter. Sys., LLC*,
    No. 14-5497, 2015 WL 64592 (6th Cir. Jan. 5, 2015) ................................. 7

*Jonites v. Exelon Corp.*,
    522 F.3d 721 (7th Cir. 2008) ...................................................... 5, 7

*Kaczmerak v. Mount Sinai Medical Center*,
    No. 86-C-0472, 1988 WL 81633 (E.D. Wis. Feb. 24, 1988)....................... 8

*Kuznyetsov v. West Penn Allegheny Health Sys.*,
    No. 10-948, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011) ................. 25, 26

*Leahy v. City of Chicago*,
    96 F.3d 228 (7th Cir. 1996) ......................................................... 8

*Lugo v. Farmer's Pride Inc.*,
    737 F. Supp. 2d 291 (E.D. Pa. 2010) .............................................. 6

*Lusardi v. Xerox Corp.*,
    118 F.R.D. 351 (D.N.J. 1987)................................................... 6, 24

*Pacheco v. Boar's Head Provisions, Inc.*,
    671 F. Supp. 2d 957 (W.D. Mich. 2009) ............................. 6, 7, 22, 23

*Proctor v. Allsups Convenience Stores, Inc.*,
    250 F.R.D. 278 (N.D. Tex. 2008) ................................................. 5, 6

*Reed v. County of Orange*,
    266 F.R.D. 446 (C.D. Cal. 2010) ................................................. 5, 9

*Reyes v. Texas Ezpawn, L.P.*,
    No. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007) .............. 26, 27

*Saleen v. Waste Mgmt., Inc.*,
    No. 08-4959, 2009 WL 1664451 (D. Minn. June 15, 2009) .................... 22

*Smith v. Micron Electronics, Inc.*,
    2005 WL 5336571 (D. Idaho Feb. 4, 2005)...................................... 9, 27

*Thompson v. Speedway Superamerica LLC*,
    No. 08-CV-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009)................. 23

*White v. Baptist Mem. Health Care Corp., et al.*,
    699 F.3d 869 (6th Cir. 2012) .......................................... 7, 22, 27

*Zavala v. Wal-Mart Stores. Inc.*,
  2010 WL 265210 (D.N.J. Jun. 25, 2010).................................................................................... 5, 9

**Statutes**

29 C.F.R. § 785.11 ................................................................................................................... 25

29 U.S.C. § 201 ........................................................................................................................... 1

29 U.S.C. § 216(b) .............................................................................................................. 5, 7, 9, 26

# I.    INTRODUCTION

Plaintiffs' Amended Complaint alleges a wage and hour action under the Fair Labor Standards Act ("FLSA") 29 U.S.C. § 201, *et seq.* brought by Evangelina Aguilera and Angelina Nunez, the two named Plaintiffs, on behalf of Environmental Services staff ("Housekeepers") and certified nursing assistants ("CNAs") who are or were employed by Defendants at WMH. On August 18, 2014, the Court applied the relatively lenient standard applicable in the first stage of class certification, and conditionally certified two separate classes:

> The Collective Housekeeper Class: All persons who have worked for Waukesha Memorial at any time since May 9, 2011 as a Housekeeper and who have been denied pay during unpaid meal periods, despite being required to monitor a phone, pager, and/or walkie-talkie or having had their unpaid meal period interrupted by work without compensation.
>
> The Collective Certified Nursing Assistance Class: All persons who have worked for Waukesha Memorial at any time since May 9, 2011 as a Certified Nursing Assistant ("CNA") and who have been denied pay during unpaid meal periods, despite being required to monitor a phone, pager, and/or walkie-talkie or having had their unpaid meal period interrupted by work without compensation.

[Dkt. 44, at pp. 1-2].

Following conditional certification, notice was sent to approximately 443 CNAs and 136 Housekeepers.   Twenty-five CNAs and six Housekeepers opted to join the respective conditionally certified FLSA classes.   The parties have engaged in significant discovery, including taking the depositions of the two Named Plaintiffs, four Opt-In Housekeepers, 12 Opt-In CNAs, three of Defendants' Federal Rule of Civil Procedure 30(b)(6) representatives, five Housekeeper supervisors, and 10 CNA supervisors.

The deposition testimony and documentary evidence of record demonstrates the individual nature of each Opt-in Plaintiffs' claims and applicable defenses.   Thus, Defendants now move for decertification. Neither the class of Opt-In Housekeepers nor the class of Opt-In

CNAs are similarly situated with respect to whether or not they carry communication devices during meal periods, whether they respond to phone calls or pages during their meal breaks, whether they reversed the meal deduction in the Kronos time-keeping system if a work task is performed during a meal period, or whether they have notified a supervisor regarding work performed during meal breaks without compensation. The employment and factual settings of the Opt-In Plaintiffs differ based on personal experience, shift, and department. Particularly where individual Opt-In Plaintiffs failed to follow the applicable ProHealth Care Time Recording Policy with respect to meal breaks and canceling the automatic meal period deduction, they have done so on an individual basis and are therefore subject to individual defenses.

Defendants' Time Recording Policy is, on its face, lawful. The localized implementation of meal period and timekeeping procedures within each department based on patient needs, along with myriad other differences in the Named Plaintiffs' and Opt-In Plaintiffs' work settings, renders the Opt-In Plaintiffs so dissimilar from one another and from the Named Plaintiffs that the respective classes should be decertified. Given the discrete nature of the claims at issue, adjudication of liability will require this Court to engage in fact-specific trials for each Opt-In Plaintiff. This inability to make class-wide determinations undermines the propriety of a collective action. Accordingly, this Court should grant Defendants' Motion and decertify this action.

## II.     BACKGROUND

ProHealth Care, Inc. is a community based health care system that includes Waukesha Memorial Hospital. Currently there are approximately 138 Housekeepers and 184 CNAs employed at WMH. Ildiko Huppertz ("Huppertz"), Dkt. 36-2 at 133:13-16; 184:13-16.

**A.      Time Keeping System.**

The Hospital utilizes the well known Kronos timekeeping system, www.kronos.com. Huppertz, Dkt. at 36-2, 74:04-09; Time Recording Policy, Dkt. 93-2, p. WMH000123. Employees use the Kronos time clocks located throughout WMH to swipe in and out upon the commencement and conclusion of a shift.  Huppertz, Dkt. 36-2 at 35:06–36:07; Time Recording Policy, Dkt. 93-2, p. WMH000124.  Any employee, including Housekeepers or CNAs, who opt to leave the WMH premises during a meal break are expected to swipe in and out on the Kronos system.  Huppertz, Dkt. 36-2 at 89:07-15; Time Recording Policy, Dkt. 93-2, p. WMH000123.

**B.      Time Recording Policy.**

WMH maintains a policy of automatically deducting a thirty-minute meal period from every shift over six hours worked by a Housekeeper or CNA. Time Recording Policy, Dkt. 93-2, p. WMH000125.  If a meal period is interrupted, a Housekeeper or CNA must utilize the "cancel lunch" function key to indicate the interrupted meal period at a time keeping terminal.  Time Recording Policy, Dkt. 93-2, p. WMH000125.  The Time Recording Policy does not address how it is to be implemented at the department level, as each department differs based on patient needs and daily functioning.  WMH vests managers and professional staff members with the responsibility of customizing meal period procedures and practices to address the unique characteristics and patient needs of each department. If the "cancel lunch" function is utilized, the automatic deduction is reversed and the employee is paid for that work time.  In pertinent part, the Time Recording Policy reads:

**Policy:**

Time Records are official, permanent and legal payroll records.  All employees have the responsibility to accurately report worked and non-worked paid hours.  The department manager or a designated authorizer is responsible for approving time records prior to payroll processing.

**Procedure:**

1) **Time Recording**

\*\*\*

    d.    Hourly employees who leave a ProHealth care facility during their scheduled shift for a non-work related activity, are required to swipe out at the timekeeping terminal and swipe back in when they return.  This includes meal breaks that are taken off campus.

\*\*\*

6) **Meal Breaks**

    a.    Employees who stay on campus during their meal breaks are not required to swipe in or out for the meal break.  An automatic 30 minutes will be deducted from their shift.

\*\*\*

    c.    If a meal break is not taken or the employee stays on campus and takes less than a 30 minute meal break, the "cancel lunch" function key must be utilized to indicate this a the time keeping terminal.  Managers have the responsibility to review the use of the "cancel lunch" function within their department.

ProHealth Care Time Recording Policy Last Reviewed on March 30, 2010, Declaration of David C. Van Dyke, Dkt. 93-1; ProHealth Care Time Recording Policy Last Reviewed on September 21, 2012, Declaration of David C. Van Dyke, Dkt. 93-2.

The Opt-In Plaintiffs consistently testified that in each and every instance a meal break was canceled, she was properly compensated.  *See, e.g.*, Lauren Kaucic ("Kaucic"), Dkt. 69-7, at 45:02 – 45:08; Kimberly Ferris ("Ferris"), Dkt. 69-13 at 44:8-11; Mitziel Ocasio ("Ocasio"), Dkt. 69-3 at 59:21-25.

## III.    LEGAL STANDARD

The Fair Labor Standards Act, § 216(b), permits actions by "any one or more employees for and on behalf of himself or themselves and other employees similarly situated." *See Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010); *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008).  Employees, however, do not have a right to proceed in a collective manner. To demonstrate the propriety of collective treatment, Plaintiffs must factually establish

their similarity to each other and the putative class. This Court has adopted a two-stage process for determining whether a collective action under § 216(b) is proper. *See Espenscheid v. DirectSat USA, LLC*, 2010 WL 2330309, at *6 (W.D. Wis. Jun. 7, 2010). At both stages, the Court must determine whether the Plaintiffs are "similarly situated" within the meaning of § 216(b). *Id*. During the first stage, Plaintiffs are afforded a lenient burden. *Id*. (articulating and applying "modest factual showing" standard of review at stage one).

The second stage of the analysis, "decertification," occurs after discovery, and implicates a far more stringent standard. *See Reed v. County of Orange*, 266 F.R.D. 446, 449-50 (C.D. Cal. 2010); *Zavala v. Wal-Mart Stores. Inc.*, 2010 WL 265210, at *5 (D.N.J. Jun. 25, 2010) (rejecting plaintiffs' urging to focus on the "leniency" of class certification and reasoning that the 'lenient standard applies only at the first stage . . . . Here at the second stage, the Court must employ a stricter standard to determine whether [p]laintiffs are similarly situated'). While Defendants are the "movants" at this second-stage, the burden remains on Plaintiffs to establish that they are "similarly situated" to themselves and the class of opt-in Plaintiffs. *See Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008). Plaintiffs must present admissible evidence to meet the more "rigorous" analysis applicable at stage two. *See Pacheco v. Boar's Head Provisions, Inc.*, 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009) (noting that "[a]t the close of discovery, [the Court] make[s] a second determination, using a more rigorous standard, as to whether the lead plaintiffs and the opt-in plaintiffs are similarly situated"); *Proctor*, 250 F.R.D. at 280 (finding that at decertification stage, the inquiry is "much more stringent"); *Duncan v. Phoenix Supported Living, Inc.*, No. 2:05 CV 1, 2007 WL 1033360 at *3 (W.D.N.C. Mar. 30, 2007) (noting that at the "second [stage], a higher standard is used to analyze the 'similarly situated' issue").

"At this second stage, the burden is on the Plaintiff to prove that the individual class members are similarly situated." *Proctor*, 250 F.R.D. at 280. To make this determination, the Court should consider "a variety of factors, including the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action." *Pacheco*, 671 F. Supp. 2d at 959-60; *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007); *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 299 (E.D. Pa. 2010) (finding that second-stage of the collective action analysis calls for a "specific factual analysis" of these factors). When analyzing these factors. Court must protect the parties' due process rights by permitting collective treatment only where liability can be established as to the entire class. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370-71 (D.N.J. 1987).

Decertification is appropriate where "the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Proctor*, 250 F.R.D. at 280 (reasoning that "the more material distinction revealed by the evidence, the more likely the district court is to decertify the collective action"). "The more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defenses are, the less appropriate the matter is for collective treatment." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567 (E.D. La. 2008). Where the claims at issue are "hopelessly heterogeneous," use of the collective action mechanism in § 216(b) is "egregious." *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008); *see also, Pacheco*, 671 F. Supp. 2d at 966 (reasoning that certification is not proper where parties would be required to introduce individualized proof as to both liability and damages (*citing Gatewood v. Koch Foods of Mississippi, LLC*, No. 3:07CV82-KS-MTP, 2009 WL 8642001 (S.D. Miss. Oct. 20, 2009)).

# IV.    ARGUMENT

## A.    The Automatic Meal Deduction Policy is Legal.

The Hospital's policy of taking an automatic thirty minute pay deduction from Housekeepers and CNAs does not violate the FLSA. *See Fengler v. Crouse Health Foundation, Inc.*, 595 F. Supp. 2d 189, 195 (N.D.N.Y) ("the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA".). It is acceptable for an employer to establish a process for an employee to report uncompensated work time; where the employee fails to report uncompensated time, the employer is not liable. *White v. Baptist Mem. Health Care Corp., et al.*, 699 F.3d 869 (6th Cir. 2012). WMH maintains a policy and practice to compensate hourly employees in the event their meal breaks are actually interrupted or missed.

The basis for Plaintiffs' claim is that Housekeepers and CNAs are allegedly required to be able to hear and, if necessary, respond to a communication device during the meal break. Simply carrying a pager, phone, or walkie-talkie does not result in compensable time under the FLSA. *See*, *e.g.*, *Jones-Turner v. Yellow Enter. Sys., LLC*, No. 14-5497, 2015 WL 64592 (6th Cir. Jan. 5, 2015) (unpublished) (granting summary judgment for the employer where EMTs had to monitor a radio during a meal period and answer any calls after the first ring because EMTs were not required to do more than monitor and answer any calls). The mere fact that Housekeepers and CNAs may carry and respond to a communication device does not make the automatic deduction unlawful. The Seventh Circuit has adopted the "predominant benefit" test for determining whether meal periods constitute compensable work time under the FLSA. *Leahy v. City of Chicago,* 96 F.3d 228, n.2 (7th Cir. 1996); *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993). Under this test, an employee is considered to be completely relieved from duty during a meal period when the employee's time is not spent predominantly for the benefit of the

employer. *Leahy*, 96 F.3d at n.2. If, during meal periods, an employee's time and attention are primarily occupied by a private pursuit, presumably obtaining and eating food, then the employee is completely relieved from duty and is not entitled to compensation under the FLSA. *Id.*

The employees' obligation to carry and be able to respond to a communication device does not convert the meal break into time spent predominantly for the benefit of WMH. *Kaczmerak v. Mount Sinai Medical Center*, No. 86-C-0472, 1988 WL 81633 (E.D. Wis. Feb. 24, 1988); *Albee v. Village of Bartlett*, 861 F. Supp. 680, 685 (N.D. Ill, 1994) (police officers had to remain in radio contact during an unpaid lunch period.) Moreover, occasional interruptions do not convert a meal break into work time, because nearly any job can have demands during an employee's meal break. *Bridges v. Amoco Polvmers, Inc.,* 19 F. Supp. 2d 1375, 1379 (S.D. Ga. 1997) ("most every employee in the Nation is subject to having his lunch hour interrupted by his employer in some fashion or another ...").  WMH's meal deduction policy is legal on its face and the fact that CNAs and Housekeepers may keep communication devices during a meal period is not illegal.

**B.     The Disparate Factual and Employment Settings Require Decertification.**

In determining whether to decertify the class, the Court should "examine the plaintiffs' factual and employment settings, considering issues such as location, job duties, supervision, and salary." *Frye v. Baptist Mem'l Hosp.*, No. 07-2708, 2010 WL 3862591, at *3 (W.D. Tenn. Sept. 27, 2010). Similarities in job duties and salary alone are insufficient to establish plaintiffs are similarly situated: "the similarities necessary to maintain a collective action under §216(b) must extend beyond the mere facts of job duties and pay provisions . . . . Otherwise, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Anderson*, 488 F.3d at 953; *See Zavala*, 2010 WL 2652510, at *3.

Moreover, "[a]llegations of overarching policies are generally insufficient to establish that individual workers are similarly situated." *Zavala*, 2010 WL 2652510, at *3; *Smith v. Micron Electronics, Inc.*, 2005 WL 5336571, at *2 (D. Idaho Feb. 4, 2005). Instead, a plaintiff must provide "substantial evidence that their claims arise out of a single policy, custom, or practice that leads to FLSA violations." *Reed*, 266 F.R.D. at 450 (emphasis added); *see also, Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008); *Smith*, 2005 WL 5336571, at *2.

Defendants have, during the relevant class period, maintained a Time Recording Policy providing that: 1) Housekeepers and CNAs are entitled to a 30-minute meal break; and 2) if a meal break is interrupted or not taken, the Housekeepers and CNAs shall utilize the "cancel lunch" function key to reverse the automatic deduction.  Plaintiffs' theories of liability center on deviations from these policies.

1. **Certified Nursing Assistants.**

The Opt-In CNA Plaintiffs are or were employed as CNAs in numerous WMH units and worked various shifts during the applicable timeframe. The Named Plaintiff, Angelina Nunez ("Nunez"), and the twelve CNA Opt-In Plaintiffs who were deposed testified to notable differences among the various units in which Opt-In Plaintiffs are or were employed, particularly with respect to individualized meal period practices. The CNA Opt-In Plaintiffs who were deposed worked in the Orthopedic Care, Rehabilitation, Gastrointestinal, Cardiac, Women & Children, Neonatal Intensive Care ("NICU"), Intensive Care ("ICU"), Oncology, Medical/Surgical, and Float Pool Units. *See, e.g.*, Kaucic, Dkt. 69-7 at 5:15- 8:14; 9:10-21; Amy Knapp ("Knapp"), Dkt. 69-9 at 11:3-6; Lauren Morgan ("Morgan"), Dkt. 69-8 at 10:6 – 10:18; Michelle Marks ("Marks"), Dkt. 69-10 at 9:14-17; Hilda Kish ("Kish"), Dkt. 69-11 at 8:23. The amount of time the Opt-In Plaintiffs worked at WMH varied from several years to several months to two days. *See* Ferris, Dkt. 69-13 at 9:16-22; Amberly Zimmerman ("Zimmerman"), Dkt. 69-18 at 25:18-25; 26:1.

The Opt-In CNAs are similar in three respects. First, the Opt-In CNAs understood that, during their employment, WMH had policies and procedures by which CNAs were bound. Kaucic, Dkt. 69-7 at 18:3-19:2; Knapp, Dkt. 69-9 at 21:13-25; 22:1-3; Dkt. 93-4; Morgan, Dkt. 69-8 at 22:02-13; Ferris, Dkt. 69-13 at 35:23-24; 36:1-8; Dkt. 93-5 Zimmerman, Dkt. 69-18 at 20:22-25; 21:1-4; Dkt. 93-8; Ocasio, Dkt. 69-3 at 31:1-21; Marks, Dkt. 69-10 at 42:10; Sara Sheehan ("Sheehan"), Dkt. 69-16 at 15:13-20; Dkt. 93-6; Julie Shirley ("Shirley"), Dkt. 69-17 at 15:8-24; Dkt. 93-7. Second, the CNA Opt-In Plaintiffs understood that they were required to swipe in and out using the Kronos time keeping system if they left the premises for any reason during a shift. Kaucic, Dkt. 69-7 at 21:10 – 21:25; Knapp, Dkt. 69-9 at 24: 7-20; Morgan, Dkt.

69-8 at 24:3 – 24:5; Ferris, Dkt. 69-13 at 37:22-25, 38:1-3; Zimmerman, Dkt. 69-18 at 23, 6-12. Ocasio, Dkt. 69-3 at 35:12-15; Marks, Dkt. 69-10 at 24:24-25:1; Kish, Dkt. 69-11 at 16:7-10; Sheehan, Dkt. 69-16 at 17:11-14; Shirley, Dkt. 69-17 at 17:22-25. Third, the Opt-In Plaintiffs are similar in that many actually did cancel the meal period deduction and were compensated accordingly. Knapp, Dkt. 69-9 at 37:25; 38:1-4; 49:24-25; 50:1-2; 63:18-21; Morgan, Dkt. 69-8 at 64:13 – 64: 25. This is where the similarities end.

> **a.**        **Named Plaintiff Nunez's testimony.**

Named Plaintiff Nunez worked on 4 Northwest, which covers Orthopedic and Neurological patients. Nunez, Dkt. 36-7 at 20:12-21. Nunez did not have scheduled breaks. Nunez, Dkt. 36-7 at 25:17-22. Nunez knew that punching no lunch was an option and in fact canceled her lunch deduction on at least one occasion. Nunez, Dkt. 36-7 at 26:9-10, 36:7-37:7. Nunez testified that she did not regularly cancel the meal deduction because she once asked a charge nurse if she could cancel her lunch in Kronos and was told not to "because of the budget." Nunez, Dkt. 36-7 at 26:1-4.

> **b.**        **The duties performed by the Opt-In CNA Plaintiffs differ among units.**

The duties of CNAs vary from unit to unit. In the Women & Children, Orthopedic, GI and Medical Units the main duties of a CNA include assisting patients with activities of daily living and monitoring vital signs. Knapp, Dkt. 69-9 at 12:5-23; Ferris, Dkt. 69-13 at 35:6-15; Zimmerman, Dkt. 69-18 at 23:13-17. In the NICU, by contrast, CNA responsibilities are less patient focused; CNAs are in charge of ordering materials and quality control of machines. Marks, Dkt. 69-10 at 13:8-19. The CNA role on the Psychiatric Unit is different from other units because most of the activities are group activities. Shirley, Dkt. 69-17 at 19:16-20:7.

### c. The Opt-In CNA Plaintiffs did not all carry communication devices.

The conditionally certified class members differ with respect to the very essence of this lawsuit: *not all CNAs carry communication devices throughout their shift or on meal breaks*. In the Psychiatric Unit, CNAs only use phones if they transport a patient outside of the locked unit. Shirley, Dkt. 69-17 at 24:12-15. In the Psychiatric Unit, CNAs "rarely" carry communication devices, and only do so when providing one-to-one observation on a difficult patient or escorting a patient outside of the Psychiatric unit. Corrine Gresen ("Gresen"), Dkt. 69-26 at 23:17-21; 24:20-25:4.

Where CNAs do carry communication devices, which were most often SpectraLink wireless phones ("SpectraLink"), the manner in which CNAs are contacted varies significantly. In the Heart Care, Orthopedic, 5 Northwest, 5 Southwest, Women & Children and 2 North Units, patients are not provided direct phone numbers for CNAs; rather, the patient call lights activate the CNA phones. *See, e.g.*, Kaucic, Dkt. 69-7 at 26:15-26:18; 49:8-49:11; Morgan, Dkt. 69-8 at 42:2-22, Marks, Dkt. 69-10 at 22:1-9; 20:9-22. In the ICU, CNAs are not called by patients; rather, the patient call lights go to the nurse's station. Kaucic, Dkt. 69-7 at 48:23-48:25; Morgan, Dkt. 69-8 at 42:22-42:25; Shirley, Dkt. 69-17 at 27:14-24. On 5 Southwest, patient call lights simultaneously ring to the phones carried by CNAs and the main unit desk, which is occupied by a Health Unit Coordinator ("HUC"). Kish, Dkt. 69-11 at 20:3-12. If a CNA does not answer the phone, the HUC answers the same call and addresses the patient need. Kish, Dkt. 69-11 at 20:3-16.

The phone system in the NICU is quite different from other units. The NICU is a locked unit, Marks, Dkt. 69-10 at 15:16-17, and a single phone number allows anyone to call into the unit, including parents of the infants, WMH staff, or physicians. Marks, Dkt. 69-10 at 13:21-25.

When a call is placed to the NICU, multiple phones ring: the front phone, which is located at the HUC desk; a phone towards the front of the unit; a phone near the lunch room; and a phone carried by the CNA. Marks, Dkt. 69-10 at 13:21-15:13. In the NICU, anyone who is near any of the ringing phones is expected to answer: the calls do not ring only to the CNA. In fact, Plaintiff Marks testified that she would not answer the phone "if someone else would get to it before [her]." Marks, Dkt. 69-10 at 27:23-25.

### d. The Opt-In Plaintiffs differ in their understanding of when they must answer the SpectraLink phone.

The Opt-In Plaintiffs differ with respect to their understanding of when they were required to answer the phones. There were certain circumstances in which many Opt-In Plaintiffs knew they were not required to answer their phones: when assisting a patient, when the CNA is in an isolation room, or when using the restroom. Ocasio, Dkt. 69-3 at 56: 16-25; 57:1-7; Marks, Dkt. 69-10 at 28:20-25; 29:5-20:3. However, Plaintiff Ferris testified that she answered the phone when she was personally using the restroom, and that she understood it was "implied" she should do so, and that she would take her phone into isolations rooms which other Opt-In Plaintiffs knew was prohibited. Ferris, Dkt. 69-13 at 30:15-24; 31:6-9; 31:17-21.

One Opt-In Plaintiff, Zimmerman, would not answer her SpectraLink phone when she was on a meal period: ultimately, according to Zimmerman, it was the nurses' primary responsibility to answer patient call lights when Zimmerman was on lunch and the nurses understood that she would not answer while on a meal break. Zimmerman, Dkt. 69-18 at 35:23-25; 36:1-6. Zimmerman regularly ignored calls from patients to whom she was not assigned. Zimmerman, Dkt. 69-18 at 31:25; 32:1-2. *Zimmerman did not recall getting any calls during her lunch break*, other than a single instance when an alarm from a monitoring device rang to her phone (and Zimmerman did not even respond to that call). Zimmerman, Dkt. 69-18 at 35:9-15.

Zimmerman knew that she was not required to respond to calls on her phone during a meal period, and did not even respond to an alarm call on her phone. Zimmerman, Dkt. 69-18 at 36:15-20.

Plaintiff Marks likewise testified that if the SpectraLink phone rang during a meal period, it was not expected that she would answer the phone. Marks, Dkt. 69-10 at 38:10-13. When the phone rings in the NICU, it is answered by anyone available. Marks, Dkt. 69-10 at 38:22-25. Likewise, when Plaintiff Marks worked on the Women & Children unit she would let calls ring through to the nurse during meal breaks, depending on which nurses were working. Marks, Dkt. 69-10 at 40:9-16. According to Marks, nurses varied in their reactions to receiving calls that bounced from the CNAs, so whether Marks allowed the call to rotate to the nurse through during a meal break depended on the personality of the nurse. Marks, Dkt. 69-10 at 40:9-19.

> **e.** **The Opt-In Plaintiffs are vastly different with respect to the frequency with which they are allegedly interrupted**.

The Opt-In Plaintiffs have clearly testified that there are differences from unit to unit with respect to the frequency with which meal breaks were allegedly interrupted. Plaintiff Saucerman actually compared the Orthopedic unit to the critical care unit and stated that "[t]hey were real good about meal breaks" in the critical care unit. Kristine Saucerman ("Saucerman"), Dkt. 69-12 at 32:15-17. Saucerman testified that in the critical care unit, she always received an uninterrupted meal break. Saucerman, Dkt. 69-12 at 33:19-23. Opt-In Marks testified that she had to leave her break on the NICU for a crash or physician call more often than on Women & Children because the patient population was a higher risk. Marks, Dkt. 69-10 at 43:15-22. Opt-In Marks also testified that it was less common on Women & Children that she would answer a call during a meal break period. Marks, Dkt. 69-10 at 47:15-18. Shirley, a CNA in the float pool, testified that Women & Children, Heart Care and Oncology were lighter than other units with

respect to calls. Shirley, Dkt. 69-17 at 32:2-5. Shirley testified that when she worked on the Psychiatric unit she spent her entire meal period in the cafeteria rather than returning to the floor. Shirley, Dkt. 69-17 at 48:9-11.

### f.   The Opt-In Plaintiffs' experience differed by shift.

There are also differences among shifts even within the same unit. Plaintiff Kish testified that on 5 Southwest the first and second shifts are very different with respect to who communicates with CNAs, and the type of tasks performed by CNAs. Kish, Dkt. 69-11 at 22:25-23:23. Plaintiff Kish also testified that while she believes she averaged 30 to 50 phone calls during first shift, her phone only rang 10 to 12 times on second shift because her patients were often sleeping. Kish, Dkt. 69-11 at 32:21-33:12. Plaintiff Knapp testified that whether she received a phone call during her meal break varied greatly from unit to unit and shift to shift. Specifically, Knapp testified that when working the night shift on Women & Children unit, her meal breaks were generally not interrupted, though in Orthopedics during the afternoon/evening shift she testified that she regularly received calls on her SpectraLink phone during a meal period. Knapp, Dkt. 69-9 at 46:2-11; 47:15-17.

### g.   Opt-In Plaintiffs differ in the nature of the alleged interruptions.

The Opt-In CNAs differ in their practice when a Communication Device rings during a meal break. Some Opt-In CNAs simply answer a call, state they are on a meal break and ask a nurse or colleague to perform the requested task. Kaucic, Dkt. 69-7 at 29:8-29:16; 31:5-31:19; Morgan, Dkt. 69-8 at 69:19- 69:25. In other cases, Opt-In Plaintiffs actually leave meal breaks to perform tasks. Marks, Dkt. 69-10 at 39:5-8.

h.      **The Opt-In Plaintiffs have disparate understandings of cancelling meal deductions in Kronos.**

The Opt-In CNAs differ in their knowledge or understanding regarding canceling meal breaks. Some CNAs understood that if they left a meal break to tend to a patient, they could reverse the meal deduction and be compensated for the meal break. Kaucic, Dkt. 69-7 at 32:10-32:14; Knapp, Dkt. 69-9 at 37: 18-24; Morgan, Dkt. 69-8 at 78:12-78:25. Plaintiff Saucerman, on the other hand, testified that she was not aware WMH deducted a thirty minute meal break, does not recall being told that a thirty minute meal break was part of a shift over six hours, and does not believe she was trained on how to use the "cancel lunch" function in Kronos. Saucerman, Dkt. 69-12 at 22:24-24:4. Plaintiff Ferris testified that she did not know she could cancel the meal deduction if she skipped or was interrupted during her lunch break while she worked at Waukesha, though she was aware she could manually record an interrupted meal period. Ferris, Dkt. 69-13 at 42:23-24; 43:1-4; 43:16-24. Other Opt-In Plaintiffs were aware that WMH deducted a 30-minute meal break and knew how to use the "cancel lunch" function." Morgan, Dkt. 69-8 at 25:11-18.

i.       **The Opt-In Plaintiffs differ in the practices implemented to avoid interruptions.**

The Opt-In Plaintiffs differ with respect to efforts made to avoid interrupted lunches. Plaintiff Kish testified that some, but not all, units have implemented hand-off procedures for CNA meal breaks. Kish, Dkt. 69-11 at 28:22-30:1. In some cases, the Opt-In CNAs staggered their meal periods with other CNAs to ensure that a CNA was always on the floor and available. Kaucic, Dkt. 69-7 at 35:19-36:1; Knapp, Dkt. 69-9 at 27: 13-16; 30:15-24; Ocasio, Dkt. 69-3 at 53:20-23. Other Opt-Ins regularly rounded (rotate between patients to see how they were doing) with patients to avoid interruptions. Knapp, Dkt. 69-9 at 52:25; 53:1-6; Zimmerman, Dkt. 69-18

at 40:1-8, 40:16-20; Sheehan, Dkt. 69-16 at 28:3-16.  Rounding is more common during the day than during the night shift.  Knapp, Dkt. 69-9 at 51:16-25; 52:1-9.  In NICU and Women & Children units, where there is only one CNA, Plaintiff Marks would round with patients and notify the nurses prior to taking a meal break, and would make sure not to go to lunch at the same time as other staff on the unit.  Marks, Dkt. 69-10 at 32:17-33:25.

> **j.**     **The Opt-In Plaintiffs differ with respect to management knowledge of unpaid time worked.**

The Opt-In Plaintiffs also have very different interactions with supervisors with respect to instruction regarding meal breaks, a key element if Plaintiffs plan to allege a "policy to violate a policy."  Supervisor knowledge is also key to whether WMH was aware of uncompensated work. Plaintiff Kaucic was informed by supervisors that she should take a half-hour lunch break everyday.  Kaucic, Dkt. 69-7 at 23:2 – 23:4.  Plaintiff Sheehan was approached by a supervisor when she punched "cancel lunch" four times in one week, and was told to rearrange time management to ensure that she was able to get a break.  Sheehan, Dkt. 69-16 at 21:11-19. Sheehan testified that her supervisor "implied" that she should change her behavior with respect to the frequency she pressed no lunch.  Sheehan, Dkt. 69-16 at 37:14-21.

Plaintiff Marks never told a supervisor that she felt she was missing lunch too often or that she was missing a meal break but not recording the missed meal break in Kronos.  Marks, Dkt. 69-10 at 36:21-24; 41:14-18.  Plaintiff Sheehan specifically testified that there were occasions on which she missed a meal break but did not press no lunch, but did not tell anyone. Sheehan, Dkt. 69-16 at 30:10-16.  Plaintiff Morgan indicated that while she often chose to answer her phone while she was on a meal break she knew that she did not have to answer her phone during meal breaks.  Morgan, Dkt. 69-8 at 60:15 – 60:19; 61:4 – 61:7.  Marks was never told not to cancel an interrupted lunch in the Kronos system.  Marks, Dkt. 69-10 at 51:18-20**.**

Plaintiff Kish, when asked whether she told a supervisor that she was being interrupted on meal breaks, responded that she spoke to her supervisor "as little as possible." Kish, Dkt. 69-11 at 47:16-19. The only conversation Kish had about missing lunches was actually to tell a charge nurse that she punched "no lunch" again because she was on the floor. Kish, Dkt. 69-11 at 48:3-10.

## 2. Environmental Services Staff (EVS), Housekeepers.

The testimony of the Named and Opt-In Plaintiffs reveal that the Housekeepers are not similarly situated with respect to their understanding of, and their practices related to, meal periods, canceling meal periods, and communication or instruction with supervisors regarding meal periods. Housekeeper meal break practices differ drastically even within the timeframe of the conditionally certified class, creating marked differences depending on when each Opt-In Plaintiff was employed. The implementation of the EPIC system in October 2011, which significantly changed the way that EVS meal breaks are handled, means that the work experiences and practices of Housekeepers with respect to meal breaks is not uniform, or even similar, for the entire time period of the conditionally certified class.

The EVS Opt-In Plaintiffs were aware that WMH has policies and procedures in place, and that they were bound by the same. Angeles Gonzalez ("Gonzalez"), Dkt. 69-14 at 5:01-09; Penny Cramer ("Cramer"), Dkt. 69-4 at 15:17-25, Exhibit 65. The EVS Opt-In Plaintiffs also understood that they were to swipe in and out using the Kronos system, and were required to do the same if they left the premises during a shift for any reason. Gonzalez, Dkt. 69-14 at 15:8-11; Savoie, Dkt. 69-15 at 26:17-27:3; 28:17-23. As with the CNA Opt-In Plaintiffs, that is where the similarities end.

### a. Named Plaintiff Evangelina Aguilera.

Named Plaintiff Aguilera testified that she knew how to record in the Manual Edit Log that she missed a meal period, but never did so. Evangeline Aguilera ("Aguilera"), Dkt. 36-6 at 20:1-10. Plaintiff Aguilera testified that in a typical shift she gets at least two pages. Aguilera, Dkt. 36-6 at 25:7-9. Aguilera testified that her meal break is at 6:30 P.M. each day and that she uses the EPIC system to log on and off of her meal break. Aguilera, Dkt. 36-6 at 33:13-20; 30:20-31:4. Aguilera testified that she received a call on her pager at least twice per week during a meal period, sometimes more and sometimes less. Aguilera, Dkt. 36-6 at 50:1-9. Aguilera has never told a supervisor that she missed a lunch. Aguilera, Dkt. 36-6 at 51:17-19. Aguilera testified that in some cases she is asked to leave her meal period to perform a task, and in other cases she simply informs the supervisor that she is on a meal period and continues with her meal. Aguilera, Dkt. 36-6 at 52:6-12.

### b. Housekeepers have different experiences with meal periods pre- and post-EPIC.

On October 1, 2011 WMH implemented the EPIC system, which changed how Housekeepers take uninterrupted meal breaks. Jon Kraatz ("Kraatz"), Dkt. 69-29 at 35:21-23. Prior to implementation of EPIC, Housekeepers were assigned particular meal break times; supervisors and team leaders knew when breaks were scheduled and did not call particular Housekeepers during their assigned meal break time. When a scheduled meal break needed to be changed due to work demands, that change was communicated to the supervisor. Adrianna Caballero ("Caballero"), Dkt. 87-3 at 95:5-22; 96:14-22.

Since October 1, 2011, WMH has used EPIC both to assign Housekeeper tasks and to prevent meal break interruptions. At the beginning of a shift, Housekeepers are logged on to EPIC by a supervisor by name, assigned work area, and pager number. Marian Thornburg

("Thornburg"), Dkt. 36-5 at 96:20-97:06; 115:23-119:08.  The EPIC system is the central hub for

paging Housekeepers and assigning tasks to Housekeepers.  Caballero, Dkt. 87-3 at 36:20-37:20.

In the Housekeeping department, a central dispatch line (the "Dispatch Phone") is carried by a

team leader.  When a Housekeeper is needed, WMH staff members in all departments call the

Dispatch Phone; the supervisor carrying the Dispatch Phone then uses EPIC to assign a

Housekeeper to the particular task.  Caballero, Dkt. 87-3 at 22:19-24:7; 27:20-25.  Simply by

logging into EPIC from any computer throughout WMH, a housekeeping team leader or

supervisor can see which Housekeepers are logged out for a break as a small "coffee cup" icon

will appear next to his or her name.  Thornburg, Dkt. 36-5 at 127:11-16; Caballero, Dkt. 87-3 at

37:23-38:16.  A page to a Housekeeper will not go through if he or she is logged on break in

EPIC.  Thornburg, Dkt. 36-5, at 131:8-12; Caballero, Dkt. 87-3 at 122:4-9.  Two of the four Opt-

In Plaintiffs worked prior to implementation of EPIC and therefore did not log on and off a meal

break in the EPIC system. Gonzalez, Dkt. 69-14 at 22:17-24; Pamela Savoie ("Savoie"), Dkt. 69-

15 at 32:23-25; 33:1; 32:16-22.  Opt-In Price, unlike the other Opt-In EVS Plaintiffs, regularly

utilized the EPIC System to log in and out of her meal period.  Price, Dkt. 69-5 at 36:1-6.

   c.    **The Opt-In Plaintiffs differ in their understanding of the time keeping system.**

Opt-In EVS Plaintiff Gonzalez was aware that a thirty minute meal deduction was taken

each day and, if her meal period was interrupted, she could hit no lunch in Kronos and be paid

accordingly.  Gonzalez, Dkt. 69-14 at 21:12 – 21:23.  Two other Opt-In Plaintiffs simply allege

that they did not know that they could cancel the meal deduction in Kronos.  Cramer, Dkt. 69-4

at 43:1-25; Savoie, Dkt. 69-15 at 37:2-12.  Plaintiff Gonzalez testified that while she knew she

could cancel the lunch deduction, she did not punch the "cancel lunch" feature when she had an

interrupted lunch because she believed the button was not working based on a statement made by a colleague. Gonzalez, Dkt. 69-14 at 40:15-41:7

### d. The Opt-In Plaintiffs differ in communication with supervisors regarding unpaid work.

Gonzalez testified that during the course of her entire employment, she would tell her supervisor, John Kraatz, three times per week that she did not receive a meal break. Gonzalez, Dkt. 69-14 at 32:2-5. However, Gonzalez indicated that she was told by management that she should not skip lunch and needed to take a lunch break. Gonzalez, Dkt. 69-14 at 33:18-23. Opt-In Cramer testified that she spoke with her supervisor to request coverage during meal periods. Cramer, Dkt. 69-4 at 32:1-25. Opt-In Cramer worked in the Emergency Room at WMH for five months in 2013. Cramer, Dkt. 69-4 at 7:15-17; 19:3-25; 13:1-3. Cramer testified that she was specifically told by a supervisor that she should take her break. Cramer, Dkt. 69-4 at 20:3-7; 21:14-17.

### e. The nature and frequency of alleged interrupted meal breaks differs among the Opt-In Plaintiffs based on unit assignments.

In contrast to Aguilera, who testified that she received at least two pages per shift, Cramer claimed to receive 50 to 75 calls during a shift. Cramer, Dkt. 69-4 at 43:1-25; 52:25-53:4. Like the other Opt-In Plaintiffs, Cramer testified that the meal period practice varied from unit to unit. Cramer testified that, unlike when she worked in the ER, when she was on the Surgical and OB units she always had an uninterrupted lunch break. Cramer, Dkt. 69-4 at 57:13-58:1; 58:9-24; 63:21-64:13. Price testified that she had different experiences with meal periods depending on the unit on which she was working. Price testified that when she worked on 5 Northwest she missed her lunch three times per week but did not tell a supervisor or lead. Alecia Price ("Price"), Dkt. 69-5 at 37:13-24. However, when Price was working on the OR and in the

offices, she was never interrupted during a meal break. Price, Dkt. 69-5 at 38:2-7. Savoie, unlike Named Plaintiff Aguilera, testified if she told a supervisor she was on a meal break she was nonetheless asked to leave the meal period to perform a task. Savoie, Dkt. 69-15 at 36:2-20.

The factual and legal claims asserted by the Plaintiffs vary. These variations, which derive from different factual experiences, undermine the putative "common" legal theories and substantive claims Plaintiffs' assert. Accordingly, the first factor of the certification analysis weighs heavily in favor of granting Defendants' Motion to Decertify.

## C.     Plaintiffs Cannot Show There Was a Common Policy-to-Violate-the Policy

In some instances, courts consider whether there was a policy to violate the lawful policy. *Frye*, 2010 WL 3862591, at *5; *Pacheco v. Boar's Head Provisions, Inc.*, 671 F. Supp. 2d 957 (W.D. Mich. 2009); *White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *9 (W.D. Tenn. May 17, 2011). Plaintiffs must show that "enforcement of the automatic deduction policy created a policy-to-violate-the-policy." *Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 WL 1664451, at *5 (D. Minn. June 15, 2009).

The Named Plaintiffs and Opt-In Plaintiffs have failed to show that WMH's lawful policies are violated in practice. While one Opt-In Plaintiff testified she felt it was "implied" that one should not cancel lunch, and another was spoken to about time management and encouraged to take breaks, the Opt-In Plaintiffs have not established that supervisors discouraged CNAs or Housekeepers from utilizing the Hospital's established lunch cancellation procedure. Plaintiffs utterly fail to put forth evidence of a common, hospital-wide unlawful policy, especially in light of the fact that many Opt-In Plaintiffs clearly understood how to use the missed lunch Kronos function or the Manual Edit Log. *See Adair v. Wisconsin Bell, Inc.,* No. 08-C-280, 2008 WL 4224360, at *7 (E.D. Wis. Sept. 11, 2008) ("[a]lleged FLSA violations

stemming from the enforcement decisions of individual supervisors, rather than a Hospital-wide policy or plan are not appropriate for collective treatment."); *See also, Thompson v. Speedway Superamerica LLC*, No. 08-CV-1107, 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (plaintiffs failed to submit evidence that the reason they were not compensated was because of a corporate decision to ignore their employer's published policies and not because of a rogue store manager); *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 963 (W.D. Mich. 2009) (denying class certification where plaintiffs alleged that certain supervisors did not follow otherwise lawful policy but there was no evidence that supervisors were simultaneously trained, advised, or encouraged **not** to follow the written policy).

Furthermore, determining why Housekeepers and CNAs may have worked during a meal break and failed to use the Hospital's lunch cancellation policy is highly individualized inquiry and will require a fact intensive determination that is not appropriate for class certification. A collective action is a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action. "[T]he mere fact that violations [allegedly] occurred cannot be enough to establish similarity." *Barron v. Henry Cnty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1104 (M.D. Ala. 2003). Otherwise, to say that employees are similarly situated simply because they claim violations of the law by the same employer, would be to conclude that any time an employer had two or more employees who allegedly were not being paid overtime they claim was due, the employees would be similarly situated and allowed to proceed with a collective action. *Id.* Hence, under the appropriate standard, the record evidence and the relevant decisional authority compel decertification.

**D.      Defendants Individualized Defenses Require Decertification**

"A second relevant factor is the extent to which the defenses appear to be individual to each plaintiff." *Frye*, 2010 WL 3862591, at *8. "Th[is] second factor requires consideration of whether defendants' defenses could be applied across the board to plaintiffs' claim and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." *See Duncan*, 2007 WL 1033360 at *9. "The presence of many individualized defenses makes a representative class unmanageable, and 'several courts have granted motions for decertification on this basis.'" *Frye*, 2010 WL 3862591, at *9 (*quoting Crawford*, 2008 WL 2885230, at *9).

Defendants have both the right and the intention to defend against each individual claim brought against them. *See Frye*, 2010 WL 3862591, at n.4 ("Unlike class members in a class action under Rule 23 of the Federal Rules of Civil Procedure . . . opt-in plaintiffs are party plaintiffs."). Due to the prevalence of incongruity in the named and opt-in Plaintiffs' theories discussed *supra*, Defendants will be required to present individual-specific defenses, and "such disparate individual defenses asserted by [Defendants] heighten the individuality of the claims and complicates the significant management problems." *Lusardi*, 122 F.R.D. at 465-66; *See Johnson*, 561 F. Supp. 2d at 587 (reminding that efficiency gains attendant to collective treatment "cannot come at the expense of a defendant's ability to prove a statutory defense without raising serious concerns about due process").

To prove liability, named Plaintiffs bear the burden of establishing that they and the opt-ins in fact "worked" during their meal periods under the "predominant" benefit" test, discussed *supra*. *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993). As demonstrated in Sections IV.B.1.g and IV.B.2.e, *supra,* the alleged interruptions vary in nature and duration.

If named Plaintiffs and Opt-In Plaintiffs can prove they engaged in compensable work, they then must show that their managers or supervisors had actual or constructive knowledge that each of them was working during the meal period without pay. 29 C.F.R. § 785.11. Evidence bearing on this inquiry is unavoidably individualized for each named Plaintiff and opt-in and would call for the testimony of several managers, supervisors or nurses. *See, e.g., Kuznyetsov v. West Penn Allegheny Health Sys.*, No. 10-948, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011); *Hinojos v. Home Depot, Inc.*, No. 06-cv-108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006).

This testimony would have to be on an individual basis. Some Opt-In Plaintiffs testified that they told a supervisor of missed but uncompensated meal breaks. Many of the Opt-In Plaintiffs have never told a supervisor that they worked during uncompensated time. Price, Dkt. 69-5 at 37:16-24; Aguilera, Dkt. 36-6 at 51:17-19. If supervisory knowledge is not shown on an individual basis, named Plaintiffs and opt-ins with no claim may receive a windfall. In fact, named Plaintiffs and Opt-Ins testified that they did not tell supervisors that they were working during uncompensated time. Price, Dkt. 69-5 at 37:16-24; Aguilera, Dkt. 36-6 at 51:17-19.

As these examples indicate, the applicable defenses (which include credibility concerns and personal animus) are variant and individual in nature. Defendants may also challenge each Plaintiffs' allegation through a number of individualized defenses, such as: 1) whether the individual plaintiffs was aware of Defendants' pay-for-all-time-worked policy; 2) whether the individuals were instructed by a supervisor to work for time that they were not recording; 3) whether the individual actually worked during the time alleged; 4) whether management knew that all Housekeepers and CNAs were working but not recording their time; 5) whether the overtime claimed by these individuals is subject to the FLSA's *de minimis* exception; 6) whether an individual unreasonably relied upon direction from a local supervisor; 7) whether the

individual supervisors acted in good faith in executing Defendants' lawful policy, despite an employees' mis- or under-reporting their time; and 8) whether the underreported time, if reported, would even result in the need to pay overtime. *See Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986); *Forrester v. Roth's IGA Foodliner,* 646 F.2d 413, 414 (9th Cir. 1981). Where the Plaintiffs have testified to differences in understandings of meal periods, beliefs regarding whether they must respond to communication devices during a meal period, supervisor knowledge and direction, and the nature of alleged interruptions, the Opt-In Plaintiffs cannot be treated as a collective group. These variant inquiries eliminate the ability to establish liability on a class-wide basis. Instead, adjudication of liability as to one Plaintiff will not have a corresponding effect on determining liability to other individuals, much less the entire class. In these circumstances, decertification is appropriate.

**E.  Fairness and Procedural Considerations Also Require Decertification**

The third "similarly situated" factor requires that any collective action be managed in such a fashion that no party is unduly prejudiced. *Kuznyetsov*, 2011 WL 6372852 at \*7. When reviewing the third factor, courts consider and balance the procedural impact and fairness of collective treatment. *See Reyes v. Texas Ezpawn, L.P.,* No. V-03-128, 2007 WL 101808, at \*6 (S.D. Tex. Jan. 8, 2007); *Frye*, 2010 WL3862591, at \*9.

The Court should review "the primary objectives of the FLSA § 216(b) collective action; (1) to lower the costs to plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity." *Reyes*, 2007 WL 101808, at \*6; *see also, Frye*, 2010 WL3862591, at \*9 ("Courts balance the reduced cost to individual plaintiffs and any increased judicial utility that might result from collective action against the potential detriment to the

defendant and any possible judicial inefficiency."). Further, the Court "must also consider whether it can coherently manage the class in a manner that will not prejudice any party or be particularly burdensome on a jury." *Id*; *Reyes*, 2007 WL 101808, at *6.

Here, any benefit derived from proceeding collectively is vastly outweighed by countless factual inquiries that require individualized attention. *See Frye*, 2010 WL3862591, at *9 (finding no waste of judicial resources where disparate factual and employment setting predominated). Additionally, as demonstrated above, Plaintiffs are not similarly situated, and the issues in the case are highly individualized. It would be fundamentally unfair, without proof of a uniformly applied policy and in light of the disparate theories and factual allegations, to allow a jury to find that the experiences of a few individuals are indicative of how Defendants treated the remainder of the opt-in class. Such an exercise would, in essence, ask the jury to accept facts as true where competent evidence holds otherwise (or where there is no competent evidence at all).

Furthermore, the record shows that named Plaintiffs' experiences are not proxies for the opt-ins. As a result, the Court should not allow the case to proceed on a representative nature. No testimony from any named Plaintiff or opt-in can adequately address the varied meal period policies and practices and experiences across the entire Hospital. *White v. Baptist Mem'l Hosp.*, 2011 WL 1883959, at *14 ("If representative evidence that would resolve the fairness and manageability issues in this case were readily available, the Court would expect [the plaintiff] to rely on that testimony to support her arguments."); *Smith*, 2007 WL 2385131, at *8; *Johnson v. Big Lots Stores*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits-for either side-that is reached on the basis of purported representative evidence.").

## V.    CONCLUSION

For the foregoing reasons, the Court should grant the Motion.

Respectfully submitted,

By:    /s/ David C. Van Dyke
DAVID C. VAN DYKE (IL ARDC NO. 6204705)
ONE OF THEIR ATTORNEYS

DAVID C. VAN DYKE (IL ADRC NO. 6204705)
EMILY E. BENNETT (IL ARDC NO. 6305461)
HOWARD & HOWARD ATTORNEYS PLLC
200 S. Michigan Avenue #1100
Chicago, Illinois 60605
Telephone: 312-372-4000
Facsimile: 312-939-5617
dvandyke@howardandhoward.com
ebennett@ howardandhoward.com

MICHAEL R. LIED (IL ARDC NO. 6197844)
HOWARD & HOWARD ATTORNEYS PLLC
One Technology Plaza, Suite 600
211 Fulton Street
Peoria, Illinois 61602
Telephone: 309-672-1483
Facsimile: 309-672-1568
mlied@howardandhoward.com

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on March 16, 2015, I provided service to all counsel by causing a true and correct copy of *Memorandum of Law in Support of Defendant's Motion to Decertify the FLSA Collective Action* to be served on all counsel of record by the Court's CM/ECF System.

Summer H. Murshid
Larry Johnson
Timothy P. Maynard
Hawks Quindel, S.C.
P.O. Box 442
Milwaukee, WI 53201

By:    /s/ David C. Van Dyke
David C. Van Dyke

4833-9561-3217, v. 10